## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF ARKANSAS
## CENTRAL DIVISION

| | | |
|---|---|---|
| UNION PACIFIC RAILROAD COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | C.A. 4:22-cv-960-LPR |
| v. | ) | |
| | ) | |
| RANDY G. FRANKLIN, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM IN SUPPORT OF UNION PACIFIC
## RAILROAD COMPANY'S MOTION FOR SUMMARY JUDGMENT

Cynthia W. Kolb, Ark. Bar No. 2000156
ROSE LAW FIRM
120 East Fourth Street
Little Rock, AR  72201
Phone: (501) 377-0382
Fax: (501) 375-1309
ckolb@roselawfirm.com

- and -

Joseph P. Sirbak (admitted *pro hac vice*)
Robert S. Hawkins (admitted *pro hac vice*)
COZEN O'CONNOR
1650 Market Street, Suite 2800
Philadelphia, PA  19103
(215) 665-2000
jsirbak@cozen.com
rhawkins@cozen.com

Michael J. Mills (admitted *pro hac vice*)
Union Pacific Railroad
1400 Douglas Street
Omaha, NE  68179
(402) 544-0441
mjmills@up.com

## <u>TABLE OF CONTENTS</u>

**Page**

I.      INTRODUCTION ........................................................................................ 1

II.     UNDISPUTED FACTS RELATING TO FEDERAL PREEMPTION............................ 1

III.    ARGUMENT ............................................................................................... 5

   A.   Arkansas Code § 11-5-117 Is Preempted, As Applied to Union Pacific, by the
   Railway Labor Act. ................................................................................... 5

      1.   Federal Law Governs the Authority of a Labor Organization to Make and
      Maintain Agreements on Behalf of Represented Employees. ................................. 7

      2.   Because Adjudication of Plaintiff's State Law Claim Requires Interpretation of
      the Collective Bargaining Agreement, the RLA Preempts Plaintiff's Claims...................... 8

      3.   Even if Arkansas Law Purported to Restrict Agreements Concerning
      Collectively Bargained "Rates of Pay, Rules and Working Conditions" Governed by
      the RLA, Which it Did Not, State Law Would be Preempted. ............................................ 11

   B.   Because  Arkansas Code § 11-5-117 Discriminates Against Rail Carriers Like
   Union Pacific, It is Preempted by the ICC Termination Act. .................................................. 13

      1.   ICCTA Preempts State Regulation That Discriminates Against Rail Carriers............. 13

      2.   Arkansas Code § 11-5-117 Discriminates Against Rail Carriers. ............................... 14

IV.    CONCLUSION............................................................................................. 17

LEGAL\72990611\3

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Adrian Blissfield R.R. v. Village of Blissfield*,
  550 F.3d 533 (6th Cir. 2008) ...............................................14

*Bhd. of Maint. of Way Employees v. Chicago & N.W. Transp. Co.*,
  827 F.2d 330 (8th Cir. 1987) ...............................................10

*Bhd. of Maint. of Way Employes v. Norfolk S. Ry.*,
  C.A. No. 10-cv-07425, 2012 WL 4461690 (N.D. Ill. Sept. 25, 2012) ....................9

*Bhd. of Maint. of Way Employes v. Union Pac. R.R. Co.*,
  No. 00-1105, 19 Fed. Appx. 731 (10th Cir. 2000) ..................9

*BNSF Ry. Co. v. Town of Cicero*,
  592 F. Supp. 3d 716 (N.D. Ill. 2022) ...............................16

*Brotherhood of Maint. of Way Empl. v. Burlington N. Santa Fe R.R.*,
  270 F.3d 637 (8th Cir. 2001) .........................................8, 9

*Brotherhood of Ry. Carmen v. Missouri Pacific R.R. Co.*,
  944 F.2d 1422 (8th Cir. 1991) .............................3, 8, 9, 10

*California v. Taylor*,
  *353 U.S. 553 (1957)* ...............................................11

*City of Ozark, Ark. v. Union Pac. R.R.*,
  843 F.3d 1167 (8th Cir. 2016) ......................................13

*Consolidated Rail Corp. v. Railway Labor Execs.' Ass'n,* 491 U.S. 299, 302
  (1989) ...............................................3, 8, 9, 10

*Corzine v. Locomotive Engineers*,
  147 F.3d 651 (7th Cir. 1998) ........................................2

*CSX Transp., Inc. v. City of Sebree*,
  924 F.3d 276 (6th Cir. 2019) ......................................14

*Delaware v. Surface Transp. Bd.*,
  859 F.3d 16 (D.C. Cir. 2017) ......................................14

*Elgin, J. & E. Ry. Co. v. Burley*,
  325 U.S. 711 (1945) ...............................................8

LEGAL\72990611\3

*Hull v. Dutton*,
935 F.2d 1194 (11th Cir. 1991) ................................................................11, 12

*International Association of Machinists v. Street*,
367 U.S. 740 (1961)................................................................................7

*Kansas City S. Ry. v. Bhd. of Locomotive Eng'rs & Trainmen*,
2013 U.S. Dist. Lexis 104622, 196 LRRM 2427, 2013 WL 3874513 (W.D. La. July 25, 2013) ................................................................................8

*Lodge 76, International Association of Machinists & Aerospace Workers v. Wisconsin Employment Relations Commission*,
427 U.S. 132 (1976)................................................................................12

*Miller v. Southwest Airlines, Inc.*,
926 F.3d 898 (7th Cir. 2019) .......................................................... *passim*

*N.Y. Susquehanna & W. Ry. v. Jackson*,
500 F.3d 238 (3d Cir. 2007)................................................................14, 16

*Nordgren v. Burlington N. R.R.*,
101 F.3d 1246 (8th Cir. 1996) ................................................................15

*Norfolk S. Ry. Co. v. Dille Road Recycling, LLC*,
94 F.4th 517 (6th Cir. 2024) ................................................................13, 14

*Railway. Emps'. Dep't v. Hanson*,
351 U.S. 225 (1956)................................................................................12

*Railway Labor Execs' Ass'n v. Chicago & N.W. Transp. Co.*,
890 F.2d 1024 (8th Cir. 1989) ................................................................9

*Slocum v. Delaware, Lackawanna & Western R.R.*,
339 U.S. 239 (1950)................................................................................9, 16

*Steele v. Louisville & N.R. Co.*,
323 U.S. 192 (1944)................................................................................7

*Texas Cent. Business Lines Corp. v. City of Midlothian*,
669 F.3d 525 (5th Cir. 2012) ................................................................14

*Union Pacific R.R. v. Franklin*,
2024 Ark. 74, 687 S.W.3d 787 (Ark. 2024) ................................................15

*United Transp. Union v. Long Island R.R.*,
455 U.S. 678 (1982)................................................................................13

LEGAL\72990611\3

*Vermont Ry. v. Town of Shelburne,*
    287 F. Supp. 3d 493 (D. Vt. 2017), *aff'd*, 918 F.3d 82 (2d Cir. 2019) ...................................16

*Wightman v. Springfield Terminal Ry.,*
    100 F.3d 228 (1st Cir. 1996) ............................................................................................2

**Statutes**

49 U.S.C. § 10102(9)(A) ...........................................................................................................14

49 U.S.C. § 10501 .................................................................................................................1, 13

Arkansas Code § 11-5-117 ................................................................................................ *passim*

Arkansas Code § 16-120-802 ..........................................................................................15, 16, 17

Federal Employers' Liability Act, 45 U.S.C. § 51, *et seq.* ...................................................1, 15

Illinois Biometric Information Privacy Act 740 ILCS 14/5 to 14/25 .............................................5

Railway Labor Act, 45 U.S.C. § 151, *et seq.* ..................................................................... *passim*

**Other Authorities**

*Green Mtn. R.R.—Petition for Declaratory Ord.*, Docket No. FD 34052, 2002 WL
    1058001 (S.T.B. served May 28, 2002) .............................................................................16

LEGAL\72990611\3

## I.     INTRODUCTION

In prior proceedings in this case, the Supreme Court of Arkansas, acting in response to certification from this Court, addressed the question whether – as a *matter of state law* – the provisions of Arkansas law permitting employees of private employers to carry firearms onto the property of such employers was severable from the provisions affording employers immunity from liability, the latter of which is preempted at least in part as applied to common carriers by rail covered by the Federal Employers' Liability Act, 45 U.S.C. § 51, *et seq.* ("FELA").  With that state law issue now resolved, Union Pacific Railroad Company ("Union Pacific") now moves the Court for summary judgment on the federal law grounds asserted in its First Amended Complaint.  As we demonstrate below, application of A.C.A. § 11-5-117 against Union Pacific is preempted by the Railway Labor Act, 45 U.S.C. § 151, *et seq.* (the "RLA") and the ICC Termination Act, 49 U.S.C. §  10501 ("ICCTA").  Therefore, Union Pacific's motion for summary judgment should be granted.

## II.    UNDISPUTED FACTS RELATING TO FEDERAL PREEMPTION[1]

Franklin was employed by Union Pacific as a railroad conductor.  (SUMF 1).  In the freight railroad industry, conductors and other associated "ground service" train crew employees such as brakemen and switchmen are often referred to collectively as "trainmen." (*Id.*).  On Union Pacific, as on most large U.S. freight railroads, railroad conductors/trainmen are represented by a labor organization called International Association of Sheet Metal, Air, Rail, and Transportation Workers, Transportation Division ("SMART-TD").  (*Id.*).  Before 2008, SMART-TD was known as the United Transportation Union ("UTU"), when it merged with the Sheet Metal Workers' International Association.  (SUMF 2).  In turn, the former UTU was the

---

[1] Contemporaneously herewith, Union Pacific files its Statement of Undisputed Materials Facts in Support of Plaintiff's Motion for Summary Judgment ("SUMF").

product of the merger of multiple formerly separate railroad unions that represented various

"ground service" crafts in connection with the operation of freight trains.  (*Id.*).  SMART-TD

represents all of Union Pacific's employees who are employed as conductors/trainmen.  (SUMF

3).  A separate railroad labor organization, the Brotherhood of Locomotive Engineers and

Trainmen ("BLET"), represents the employees who operate the locomotives on freight trains by

using throttles, braking mechanisms and the like.  (*Id.*).

Under a 1985 national agreement, new locomotive engineers come from the ranks of the

conductor/trainmen craft.  (SUMF 4).  *See also Corzine v. Locomotive Engineers*, 147 F.3d 651,

653-54 (7th Cir. 1998) ("*Corzine*") (explaining that under the 1985 national "Source of Supply"

agreement, new engineers come from the ranks of conductor/trainmen, rather than the obsolete

"fireman" craft which was the former source of supply for new engineers).  Because newly

promoted locomotive engineers have low seniority in the engineer craft, they sometimes need to

exercise their retained conductor seniority to take jobs as conductors when they do not have

enough seniority to hold positions as engineers.  (SUMF 4).  *See also Wightman v. Springfield

Terminal Ry.*, 100 F.3d 228, 230, 236 (1st Cir. 1996) ("During periods of reduced engineer work,

junior engineers may have to return temporarily to train service in order to remain employed.")

(footnote omitted). Because of this "ebb and flow" of employees between train and engine

service crafts, the RLA allows employees in either of the train and engine service crafts

(conductors and engineers) to satisfy their obligation to pay union dues by paying dues to either

of the unions, national in scope, that represent train and engine service employees.  (SUMF 4).

*See also* 45 U.S. Code § 152 Eleventh (c) (providing that an employee in train or engine service

can satisfy his/her contractual "union shop" obligation by paying dues to "any one of the labor

organizations, national in scope, organized in accordance with this chapter and admitting to membership employees of a craft or class in any of said services.").

Although the RLA allows train and engine service employees to pay union dues to either SMART-TD or to BLET, SMART-TD is the ***exclusive representative*** of all railroad conductors employed by Union Pacific.  (SUMF 5).  In relevant part, Section 2 Fourth of the RLA provides that "Employees shall have the right to organize and bargain collectively through representatives of their own choosing. The majority of any craft or class of employees shall have the right to determine who shall be the representative of the craft or class for the purposes of this chapter." 45 U.S.C. § 2 Fourth.  As to railroad conductors, Union Pacific cannot lawfully negotiate collective bargaining agreements with BLET or any other union; nor may Union Pacific negotiate collective bargaining agreements with individual employees.  (SUMF 5).  SMART-TD enjoys the federally conferred status as "exclusive" representative. (SUMF 6).

The collective bargaining agreements between SMART-TD and Union Pacific include express and implied terms.  (SUMF 7).  *See also Consolidated Rail Corp. v. Railway Labor Execs.' Ass'n*, 491 U.S. 299, 302 (1989) ("*Conrail v. RLEA*")); *Brotherhood of Ry. Carmen v. Missouri Pacific R.R. Co.*, 944 F.2d 1422, 1427 (8th Cir. 1991) ("*BRC v. MoPac*").  Among those implied terms is the ability of Union Pacific to implement work rules governing the conduct of Union Pacific's union-represented employees. (SUMF 7).  As applicable here, Union Pacific has two work rules that prohibit employees from bringing firearms onto Union Pacific Property:  First, Union Pacific, like nearly 400 other railroads, follows the General Code of Operating Rules ("GCOR").  (SUMF 8).  Since at least 2000, GCOR Rule 1.12 has remained unchanged and has provided unambiguously that "[w]hile on duty or on railroad property, employees must not have firearms …"  (*Id.*).

3

Second, since at least 2003, Union Pacific has maintained a Violence and Abusive Behavior in the Workplace Policy ("Workplace Violence Policy").  (SUMF 9).  The Workplace Violence Policy has been amended from time to time but has consistently prohibited employees, other than Union Pacific Police, from possessing weapons, including firearms, while on Union Pacific property, even if the employee is licensed to carry a concealed handgun under state law. (*Id.*).  For example, the 2003 Workplace Violence Policy states that "Union Pacific employees … are prohibited from possessing or hiding weapons on their person and their vehicle while on Union Pacific property. This prohibition applies even if the individual is licensed to carry a handgun under state law."  (*Id.*).  The 2015 Workplace Violence Policy states that employees are prohibited from "possessing or hiding weapons in facilities, equipment, or vehicles used in operations while on such property, or on their persons … .  This prohibition applies even if the individual is licensed to carry a concealed handgun under state law."  (SUMF 10).  Even earlier, Union Pacific enforced its substantially similar "Rule 603" which prohibited employees from having firearms in their possession or while on company property.  (SUMF 11).

At no time has SMART-TD successfully challenged Union Pacific's rules prohibiting firearms as a violation of any collective bargaining agreement between SMART-TD and Union Pacific.  (SUMF 12).  Nor has SMART-TD negotiated, through collective bargaining, a limitation on Union Pacific's rule in any of the successive collective bargaining agreements that SMART-TD or its predecessors have negotiated.  (*Id.*).  On the contrary, Union Pacific has enforced that prohibition and has successfully defended labor arbitrations involving discipline of Union Pacific conductors who violate Union Pacific's firearms prohibition.  (*Id.*).  In negotiating successive amendments to its collective bargaining agreements with Union Pacific, SMART-TD has acquiesced in Union Pacific's work rule against carrying firearms onto Carrier property.

4

(SUMF 13). Indeed, in this very case, Union Pacific's firearms prohibition was enforced in the labor arbitration award in which the arbitration panel enforced a year-and-a-half unpaid suspension of Plaintiff Franklin for his admitted violation of Union Pacific's rule. (SUMF 14). In an Award issued April 20, 2022, the PLB sustained discipline against Franklin and specifically cautioned Franklin that Union Pacific would continue to maintain and enforce its zero-tolerance policy regarding firearms on company premises. (*Id.*). By sustaining discipline against Franklin, the arbitration panel necessarily concluded that the collective bargaining agreement agreed to by SMART-TD authorized Union Pacific to prohibit firearms on its property. (*Id.*).

In the case at bar, Franklin openly acknowledges that his claim seeks a determination, based solely on state law, that Union Pacific cannot enforce the firearm prohibition that has existed for decades pursuant to collective bargaining agreements with SMART-TD and every other labor union that represents Union Pacific's employees. (SUMF 15).

## III.   ARGUMENT

### A.   Arkansas Code § 11-5-117 Is Preempted, As Applied to Union Pacific, by the Railway Labor Act.

The RLA preemption analysis in this case closely follows the Seventh Circuit Court of Appeals' analysis in *Miller v. Southwest Airlines, Inc.*, 926 F.3d 898 (7th Cir. 2019). In *Miller*, the Seventh Circuit ruled that state law claims under the Illinois Biometric Information Privacy Act 740 ILCS 14/5 to 14/25 ("BIPA"), which Illinois adopted in 2008, were preempted by the RLA, which also covers airlines, because: (1) the labor union representing Southwest Airlines employees had the legal authority to represent employees with respect to the use of their biometric information for timekeeping purposes, and (2) the carrier had at least an "arguable" basis for its position that the union had consented to the use of such information by failing to

prohibit such use in the collective bargaining agreement. *Miller v. Southwest Airlines, Inc.*, 926 F.3d at 900.

In this case, Union Pacific has an even stronger basis for its position. Individual employees of Union Pacific are free to agree not to carry firearms onto their employer's property. SMART-TD, as the employees' bargaining representative is authorized, as a matter of federal law, to reach an identical agreement on behalf of employees that it represents.

Union Pacific's longstanding collective bargaining agreements with SMART-TD, with SMART-TD's predecessors, and with every other labor union that represents Union Pacific employees, unambiguously – and with the full knowledge of each of those labor unions – prohibits employees from carrying firearms onto Union Pacific property. Each of those unions, but especially SMART-TD for purposes of this case, has entered into countless successive collective bargaining agreements with Union Pacific – and has represented employees in disciplinary and other matters – with the full knowledge that Union Pacific work rules unambiguously prohibit the carrying of firearms onto Union Pacific property. It is far too late in the day for any of those unions to now pretend that they entered into scores of collective bargaining agreements without knowing that the past practice of the parties – the very fabric of those agreements – includes a prohibition against the possession of firearms on Carrier property.

Furthermore, as the *Miller* court recognized, federal law, not state, law, governs the authority of labor unions to represent employees. All of the labor unions that represent Union Pacific's employees have abundant authority to consent to work rules that prohibit firearms on Union Pacific's property – and they have done so – over and over again. At a minimum (and the bare minimum is all that is required for Union Pacific's preemption argument to prevail), Union Pacific's position is arguably justified under its collective bargaining agreements, and therefor

Franklin's claims are preempted by the RLA.  Finally, even if Arkansas tried to regulate the subjects of collective bargaining by restricting SMART-TD's ability to make agreements on workplace safety rules, and there is no indication that the State did so, any such effort would be preempted.

> 1. **Federal Law Governs the Authority of a Labor Organization to Make and Maintain Agreements on Behalf of Represented Employees.**

As the *Miller* court recognized, federal law governs the authority of a labor organization to negotiate on behalf of employees that it represents.  As the court stated: "As a matter of federal law, unions in the air transportation business are the workers' exclusive bargaining agents." *Miller*, 926 F.3d at 903 (citing 45 U.S.C. §152 Second; *International Association of Machinists v. Street*, 367 U.S. 740, 760 (1961)).  Moreover, while the plaintiffs in *Miller* disputed the union's authority to make agreements on behalf of employees under the Illinois BIPA statute, the court further reasoned that, since federal law governs the authority of a labor organization under the RLA, "[a] state cannot remove a topic from the union's purview and require direct bargaining between individual workers and management. And Illinois did not try." *Miller*, 926 F.3d at 903.

The plenary authority of an RLA labor organization to bargain on behalf of its members was described by the Supreme Court in *International Ass'n of Machinists v. Street*, 367 U.S. 740 (1961).  There, the Court described the RLA's provisions granting unions selected by a majority of employees in a craft or class as granting such representatives authority "comparable to those possessed by a legislative body both to create and restrict the rights of those whom it represents…." *Id.* at 760 (*quoting Steele v. Louisville & N.R. Co.*, 323 U.S. 192 (1944)).

Pursuant to this federal statutory authority, labor organizations governed by the RLA may reach agreements, including implied agreements, that bind the members they represent with

respect to terms and conditions of employment.  Cases decided under the RLA have recognized

the authority of RLA-covered labor organizations to make agreements, whether express or

implied, concerning a wide variety of subjects such as testing of employees for drugs or alcohol,

*Conrail*, *supra*, the use of inward-facing cameras to monitor train and engine service crews while

on duty, *Kansas City S. Ry. v. Bhd. of Locomotive Eng'rs & Trainmen*, 2013 U.S. Dist. Lexis

104622, 196 LRRM 2427, 2013 WL 3874513 (W.D. La. July 25, 2013), and the use of biometric

information in connection with time recording systems.  *Miller*, *supra*.

> **2.    Because Adjudication of Plaintiff's State Law Claim Requires Interpretation of the Collective Bargaining Agreement, the RLA Preempts Plaintiff's Claims.**

Disputes arising under the RLA are classified as either "major" or "minor."  A major

dispute arises where the parties do not have an existing collective bargaining agreement or where

the parties seek to change or amend an existing agreement.  *Conrail*, 491 U.S. at 303; *Elgin, J. &

E. Ry. Co. v. Burley*, 325 U.S. 711, 723 (1945).  A minor dispute, on the other hand,

"contemplates the existence of a collective bargaining agreement already concluded" and

"relates either to the meaning or proper application of a particular provision with reference to a

specific situation or to an omitted case."  *Id.*; *see BRC v. MoPac,* 944 F.2d at 1426 ("a minor

dispute involves the interpretation or application of an existing agreement"); *Brotherhood of

Maint. of Way Empl. v. Burlington N. Santa Fe R.R.*, 270 F.3d 637, 638 (8th Cir. 2001) (same).

The characterization of a dispute as a "minor dispute" does not reflect the importance or value of

the dispute.  Rather, the term "minor dispute" reflects that the nature of the dispute is one over

the interpretation or application of an existing agreement, rather than a dispute over the

formation of, or changes to, an agreement.  *Conrail*, 491 U.S. at 303-05.  Under the RLA, a

dispute is a "minor dispute" subject to mandatory arbitration so long as the carrier's position

with respect to the merits of the dispute is not "frivolous or obviously insubstantial."  *Id., BRC v.*

*MoPac*, 944 F.2d at 1427.  "[I]f doubt arises about the classification of a dispute, the dispute is also considered to be minor."  *Bhd. of Maint. of Way Employees v. Burlington N. Santa Fe R.R.*, 270 F.3d at 639 (8th Cir. 2001).

Under Section 3 of the RLA, a minor dispute is subject to "compulsory and binding arbitration" before the NRAB, or before an arbitration panel of coordinate jurisdiction established by the parties.  *Conrail*, 491 U.S. at 303; 45 U.S.C. § 153.  Sound policy reasons support the limited role of federal courts in minor disputes: "making full use of the [National Railroad Adjustment] Board (or other adjustment boards) is important because it 'help[s] to 'maintain agreements' by assuring that collective-bargaining contracts are enforced by arbitrators who are experts in 'the common law of [the] particular industry.'" *Railway Labor Execs' Ass'n v. Chicago & N.W. Transp. Co.*, 890 F.2d 1024, 1030, n.5 (8th Cir. 1989) (quoting *Conrail*, 491 U.S. at 310) (bracketed text in original).  Arbitration panels in the railroad industry are uniquely qualified to interpret railway labor agreements; Congress made a "considered effort" to establish such panels to provide "a desirable degree of uniformity in the interpretation of agreements throughout the nation's railway systems."  *Slocum v. Delaware, Lackawanna & Western R.R.*, 339 U.S. 239, 243 (1950) (railroad arbitrators "understand railroad problems and speak the railroad jargon").

The NRAB or a parallel arbitration panel "has exclusive jurisdiction over minor disputes."  *Conrail*, 491 U.S. at 304; *BRC v. MoPac*, 944 F.2d at 1427.  Federal district courts are without subject matter jurisdiction to decide the merits of RLA minor disputes.  *See id.*, *Bhd. of Maint. of Way Employes v. Union Pac. R.R. Co.*, No. 00-1105, 19 Fed. Appx. 731 (10th Cir. 2000); *Bhd. of Maint. of Way Employees v. Norfolk S. Ry.*, C.A. No. 10-cv-07425, 2012 WL

4461690, * 16 (N.D. Ill. Sept. 25, 2012) ("Minor disputes are to be decided finally by railway arbitrators and not by federal courts of limited subject matter jurisdiction").

In this case, Union Pacific contends that SMART-TD, in the exercise of the union's authority as representative of its members, has acquiesced in Union Pacific's promulgation of work rules prohibiting employees from carrying firearms onto Union Pacific property, and that this established past practice is an implied term of the parties' collective bargaining agreement. Whether SMART-TD has, in fact, exercised that authority is determined by the collective bargaining agreement, which includes not only the language of the collective bargaining agreement, but also the terms implied therein through past practice and course of dealing. *Conrail*, 491 U.S. at 311; *BRC v. MoPac*, 944 F.2d at 1429. *See also Bhd. of Maint. of Way Employees v. Chicago & N.W. Transp. Co.*, 827 F.2d 330, 334 (8th Cir. 1987), where the court affirmed the district court's ruling that a unilaterally-promulgated carrier rule prohibiting the use of intoxicants, known as Rule G, "although not part of the written collective bargaining agreement" had been in effect "for a sufficient period of time with the knowledge and acquiescence of the [carrier and union] to become part of the implied agreement of the parties."

Again, the *Miller* decision provides the applicable analysis. There, the plaintiff employees alleged that the defendant airlines violated the Illinois BIPA statute by, *inter alia*, implementing a fingerprint timekeeping system. However, with reasoning directly applicable here, the court ruled that the implementation of timekeeping systems was a proper subject of collective bargaining and the question of whether the union in fact assented to the airlines' actions required an interpretation or application of the parties' collective bargaining agreements:

> Whether Southwest's or United's unions did consent to the collection and use of biometric data, or perhaps grant authority through a management-rights clause, is a question for an adjustment board. Similarly, the retention and destruction schedules for biometric data, and whether air carriers may use third parties to

> implement timekeeping and identification systems, are topics for bargaining between unions and management. States cannot bypass the mechanisms of the Railway Labor Act and authorize direct negotiation or litigation between workers and management. … That biometric information concerns workers' privacy does not distinguish it from many other subjects, such as drug testing, that are routinely covered by collective bargaining and on which unions give consent on behalf of the whole bargaining unit.

*Miller*, 926 F.3d at 903-04.  Notwithstanding the biometric privacy rights ostensibly afforded under state law, the Court found the employees' state law claims preempted because the NRAB must interpret the parties' agreement and supply any appropriate remedy.  *Id.* at 904.

In the decades that GCOR 1.12 and Union Pacific's Workplace Violence Policy have unambiguously prohibited employees from bringing firearms onto company premises, SMART-TD has effectively acquiesced in the practice, handling prior instances of employee discipline for possessing a firearm just as they have handled discipline over other, undisputed *bona fide* work rules.  Just as in *Miller v. Southwest Airlines, Inc.*, "it is impossible to litigate under the state statute without examining what the union knew and agreed to," *Miller*, 926 F.3d at 904.  Because Congress entrusted that question to the **exclusive** jurisdiction of arbitration panels established under Section 3 of the Railway Labor Act, Franklin's claim is preempted by the Railway Labor Act.

3.	**Even if Arkansas Law Purported to Restrict Agreements Concerning Collectively Bargained "Rates of Pay, Rules and Working Conditions" Governed by the RLA, Which it Did Not, State Law Would be Preempted.**

It is literally hornbook law that "state laws that infringe upon the RLA's regulation of the collective bargaining process by establishing rules for subjects that would otherwise be subject to negotiation between the parties are preempted."  ABA/Bloomberg Law, *The Railway Labor Act*, Chapter 9, *Accommodating The RLA And Other Laws*, at 9.II.B.  Accord, *California v. Taylor, 353 U.S. 553* (1957); *Hull v. Dutton*, 935 F.2d 1194 (11th Cir. 1991).  In this case, just as in

11

*Miller*, Arkansas law does not purport to restrict the ability of SMART-TD to make agreements concerning not only rates of pay but also "rules and working conditions." Nor could it. The RLA expressly provides that "It shall be the duty of all carriers, their officers, agents, and employees to exert every reasonable effort to make and maintain agreements concerning rates of pay, ***rules, and working conditions***…." 45 U.S.C. § 152 First (emphasis supplied). A rule prohibiting firearms on an employer's property is unquestionably both a "rule" and a "working condition." An agreement made pursuant to the RLA as to a mandatory subject of bargaining between Labor and Management carries with it the "imprimatur of federal law upon it and, by force of the Supremacy Clause of Article VI of the Constitution, could not be made illegal or vitiated by any provision of the laws of a State." *Railway. Emps'. Dep't v. Hanson*, 351 U.S. 225, 232 (1956). *See also Hull*, 935 F.2d at 1196-97 (enforcement of state law requiring longevity pay for RLA-covered employees employed by a state agency preempted where it circumvented the collective bargaining process mandated by the RLA). As to these subjects of bargaining, the RLA requires that they be left unregulated by state law and governed by the agreement of the parties. *See also Lodge 76, International Association of Machinists & Aerospace Workers v. Wisconsin Employment Relations Commission*, 427 U.S. 132, 144 (1976) (as to subjects that Congress intended to be left unregulated, the result is to be decided by the free play of economic forces, not state law).

In this case, just as in *Miller*, Arkansas could not remove from the purview of collective bargaining the negotiation of collective bargaining agreements that, when interpreted in light of decades of past practice, prohibit employees from carrying firearms onto a rail carrier's property. *Miller*, 926 F.3d at 903. And, like the State of Illinois, Arkansas did not try. Because any state law purporting to restrict the parties' ability to negotiate "rates of pay, rules or working

conditions," as mandated by the RLA, is preempted, Union Pacific's motion for summary

judgment should be granted.

**B.      Because  Arkansas Code § 11-5-117 Discriminates Against Rail Carriers Like Union Pacific, It is Preempted by the ICC Termination Act.**

**1.      ICCTA Preempts State Regulation That Discriminates Against Rail Carriers.**

As vital instrumentalities of interstate commerce, railroads have been exhaustively

regulated at the federal level for more than a century.  *See United Transp. Union v. Long Island*

*R.R.*, 455 U.S. 678, 688 (1982).  Relevant here, Congress enacted the ICC Termination Act, 49

U.S.C. § 10501 ("ICCTA") in 1995, which vests in the Surface Transportation Board exclusive

jurisdiction over transportation by rail carriers and the operation of railroad facilities:

**The Jurisdiction of the Board over** –

(1) **transportation by rail carriers**, and the remedies provided in this part with respect to rates, classifications, rules (including car service, interchange, and other operating rules), practices, routes, services, and facilities of such carriers; and

(2) the construction, acquisition, **operation**, abandonment, or discontinuance **of** spur, industrial, team, switching, or side tracks, or **facilities**, even if the tracks are located, or intended to be located, entirely in one State,

**is exclusive**. Except as otherwise provided in this part, the remedies provided under this part with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law.

49 U.S.C. § 10501(b) (bold added).

Congress enacted this "broadly worded preemption provision" to "further the goal of

limited state regulation of interstate rail transportation."  *City of Ozark, Ark. v. Union Pac. R.R.*,

843 F.3d 1167, 1170 (8th Cir. 2016); *see also Norfolk S. Ry. Co. v. Dille Road Recycling, LLC*,

94 F.4th 517, 523 (6th Cir. 2024) (describing this preemptive scheme as "sweeping"). "It is

difficult to imagine a broader statement of Congress'[s] intent to preempt state regulatory

authority over railroad operations." *CSX Transp., Inc. v. City of Sebree*, 924 F.3d 276, 283 (6th Cir. 2019). ICCTA's broad sweep includes any "… yard, property, facility, instrumentality, or equipment of any kind related to the movement of passengers or property, or both, by rail, regardless of ownership or an agreement concerning use." 49 U.S.C. § 10102(9)(A). Railroad parking lots thus fall within the class of facilities covered by ICCTA preemption. *See Texas Cent. Business Lines Corp. v. City of Midlothian*, 669 F.3d 525, 533-34 (5th Cir. 2012) (ICCTA preempted city ordinance requiring paving of vehicular roads and parking areas associated with rail operations).

Critically, ICCTA does not merely preempt state laws that regulate rail carriers directly; it also preempts state laws of general applicability that effectively **discriminate** against rail carriers. *See Dille Rd. Recycling, LLC*, 94 F.4th at 526 ("A state regulation is permissible if it . . . does not discriminate against railroads"); *Delaware v. Surface Transp. Bd.*, 859 F.3d 16, 18-19 (D.C. Cir. 2017) (state regulation must be "generally applicable" and "non-discriminatory" … "without targeting the railroad industry" to avoid ICCTA preemption); *N.Y. Susquehanna & W. Ry. v. Jackson*, 500 F.3d 238, 253-55 (3d Cir. 2007) (applying STB preemption approach that "state regulation is permissible if it passes a two-part test: (1) it is not unreasonably burdensome, and (2) it does not discriminate against railroads"). This anti-discrimination requirement is generally labeled "as applied" preemption. *See Adrian Blissfield R.R. v. Village of Blissfield*, 550 F.3d 533, 541 (6th Cir. 2008).

### 2.    Arkansas Code § 11-5-117 Discriminates Against Rail Carriers.

Section 11-5-117 discriminates against rail carriers like Union Pacific by forcing them to allow employees to bring firearms onto railroad property while stripping them of the full liability protection from negligence claims afforded to every other private employer in the state. The state law is thus preempted as applied to Union Pacific.

14

As the Court is well aware, the Arkansas statutory scheme permits employees to bring and store firearms in their employers' parking lots and prohibits employers from interfering with that right.  *See* A.C.A. § 11-5-117.  Arkansas law also broadly shields employers from civil liability "for damages, injuries, or death resulting from or arising out of" actions involving those firearms.  *See* A.C.A. § 16-120-802.  The immunity provision, however, is undisputedly invalid as applied to railroads to the extent it purports to immunize them from negligence liability under the Federal Employers' Liability Act., 45 U.S.C. § 51, *et seq.* ("FELA").

Under FELA, an injured Union Pacific employee or a deceased Union Pacific employee's estate may recover damages against the railroad for an injury or death resulting from or arising out of a handgun transported or stored on Union Pacific's property, if the harm resulted from Union Pacific's negligence.  *See* 45 U.S.C. § 51.  "It is settled law that FELA preempts state-law personal injury claims by injured railroad employees against their employers and creates a uniform federal law of liability in this field."  *Nordgren v. Burlington N. R.R.*, 101 F.3d 1246, 1250 (8th Cir. 1996).  Therefore, Arkansas Code § 16-120-802 cannot exempt Union Pacific from such liability.  Mr. Franklin has never disputed this point.  *See* Order Certifying A Legal Question to the Supreme Court of Arkansas, D.I. 26, pp. 8-9 (noting Mr. Franklin's failure to dispute FELA preemption of A.C.A. § 16-120-802).

And the Arkansas Supreme Court has now clarified that "section 11-5-117 is severable from the liability-immunity provisions in section 16-120-802(a)," so "[r]egardless of whether FELA preempts section 16-120-802(a), section 11-5-117 still applies."  *Union Pacific R.R. v. Franklin*, 2024 Ark. 74, 687 S.W.3d 787, 791 (Ark. 2024).  As a result of this severability ruling, Arkansas law now mandates that (i) employees may bring firearms onto all employers' parking lots and (ii) all employers *except* rail carriers enjoy complete immunity from any resulting

liability.  In other words, this scheme treats rail carriers differently from every other employer in the State.  The result is precisely the same as if the Legislature had crafted § 16-120-802 to ensure broad immunity for Arkansas employers, with the added proviso that "in the case of rail carriers only, the immunity afforded by this section shall not apply."  Such a singling out of rail carriers plainly would be preempted.  *See BNSF Ry. Co. v. Town of Cicero*, 592 F. Supp. 3d 716, 727-29 (N.D. Ill. 2022) (holding that rail carrier properly stated a claim for ICCTA preemption where town's sewer ordinance imposed a different method of calculating assessments for railroads).

Section 11-5-117 is not saved by the fact that it does not explicitly reference rail carriers.  Whether a state statute is preempted by ICCTA depends on its "effect" on railroads, not its phrasing.  *See Delaware*, 859 F.3d at 18–19 (collecting cases).  Thus, "even pedestrian regulations like building codes"—which of course do not refer specifically to railroads—"must be applied in a manner that do not discriminate against railroad operations to avoid preemption."  *N.Y. Susquehanna & W. Ry. Corp.*, 500 F.3d at 253 (citing *Green Mtn. R.R.—Petition for Declaratory Ord.*, Docket No. FD 34052, 2002 WL 1058001, * 4 (S.T.B. served May 28, 2002)).

This principle is illustrated in *Vermont Ry. v. Town of Shelburne*, 287 F. Supp. 3d 493 (D. Vt. 2017), *aff'd*, 918 F.3d 82 (2d Cir. 2019).  In that case, a town ordinance established maximum tonnages for certain materials, including road salt, that could be stored at a single site or facility.  *Id.* at 498.  The ordinance did not specifically reference railroads and ostensibly was a facially-neutral law of general applicability.  However, because the plaintiff rail carrier's transload facility was the only facility in the town affected by the road salt storage cap, the court found the ordinance discriminatory and therefore preempted by ICCTA.  *Id.* at 500-01.

LEGAL\72990611\3

In effect, Arkansas' statutory scheme discriminates against railroad carriers like Union Pacific and intrudes upon the exclusive federal regulation over the operation of Union Pacific's facilities.  Rail carriers stand alone among Arkansas employers in simultaneously being required to permit firearms on their premises and not enjoying the complete immunity protection of § 16-120-802.  Like the road salt storage ordinance in *Vermont Railway*, the Arkansas law appears generally applicable on its face.  In practice, however, it exposes a single class of employers – rail carriers alone – to liability, specifically the catastrophic liability associated with a workplace shooting.  As the Arkansas Supreme Court has interpreted § 11-5-117 and § 16-120-802, only rail carriers are exposed to potential civil liability.  Section 11-5-117 therefore discriminates against rail carriers and cannot survive the board preemptive force of ICCTA.

## IV.   **CONCLUSION**

As a matter of law, the Railway Labor Act and ICC Termination Act preempt § 11-5-117, bringing this litigation to an end.  Union Pacific respectfully requests that the Court (i) grant its Motion for Summary Judgment, (ii) declare that §  11-5-117 is preempted, as applied to Union Pacific, by the Railway Labor Act, (iii) declare that § 11-5-117 is preempted, as applied to Union Pacific, by the ICC Termination Act, (iv) enter a permanent injunction prohibiting Defendant Franklin (directly, and through any agent or attorney representing him) from initiating a legal action under A.C.A. § 16-118-115 against Union Pacific, in any state or federal forum, (v) dismiss with prejudice Franklin's counterclaim against Union Pacific, and (vi) grant such further relief as may be just and proper.

Respectfully submitted,


Cynthia W. Kolb, Ark. Bar No. 2000156
ROSE LAW FIRM
120 East Fourth Street
Little Rock, AR  72201
Phone: (501) 377-0382
Fax: (501) 375-1309
ckolb@roselawfirm.com

- and -

Joseph P. Sirbak (admitted *pro hac vice*)
Robert S. Hawkins (admitted *pro hac vice*)
COZEN O'CONNOR
1650 Market Street, Suite 2800
Philadelphia, PA  19103
(215) 665-2000
jsirbak@cozen.com
rhawkins@cozen.com

Michael J. Mills (admitted *pro hac vice*)
Union Pacific Railroad
1400 Douglas Street
Omaha, NE  68179
(402) 544-0441
mjmills@up.com

DATED:   September 27, 2024