IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

| | |
|---|---|
| UNION PACIFIC RAILROAD COMPANY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | C.A. 4:22-cv-960-LPR |
| v. ) | |
| ) | |
| RANDY G. FRANKLIN, ) | |
| ) | |
| Defendant. ) | |

STATEMENT OF UNDISPUTED MATERIAL FACTS IN
SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Pursuant to L. Rule 56.1, Plaintiff Union Pacific Railroad Company proffers the following undisputed facts in support of its Motion for Summary Judgment. The following facts are supported principally by the Declaration of Rebecca Cates, filed contemporaneously herewith.

1. Franklin was employed by Union Pacific as a railroad conductor. In the freight railroad industry, conductors and other associated "ground service" train crew employees such as brakemen and switchmen are often referred to collectively as "trainmen." On Union Pacific, as on most large U.S. freight railroads, railroad conductors/trainmen are represented by a labor organization called International Association of Sheet Metal, Air, Rail, and Transportation Workers, Transportation Division ("SMART-TD"). (Cates Decl., ¶ 3).

2. Before 2008, SMART-TD was known as the United Transportation Union ("UTU"), when it merged with the Sheet Metal Workers' International Association. In turn, the former UTU was the product of the merger of multiple formerly separate railroad unions that

represented various "ground service" crafts in connection with the operation of freight trains. (Cates Decl., ¶ 4)

3. SMART-TD represents all of Union Pacific's employees who are employed as conductors/trainmen.  A separate railroad labor organization, the Brotherhood of Locomotive Engineers and Trainmen ("BLET"), represents the employees who operate the locomotives on freight trains by using throttles, braking mechanisms and the like. (Cates Decl., ¶ 5)

4. Under a 1985 national agreement, new locomotive engineers come from the ranks of the conductor/trainmen craft.  Because newly promoted locomotive engineers have low seniority in the engineer craft, they sometimes need to exercise their retained conductor seniority to take jobs as conductors when they do not have enough seniority to hold positions as engineers.  Because of this "ebb and flow" of employees between train and engine service crafts, the RLA allows employees in either of the train and engine service crafts (conductors and engineers) to satisfy their obligation to pay union dues by paying dues to either of the unions, national in scope, that represent train and engine service employees.  (Cates Decl., ¶ 6).

5. Although the RLA allows train and engine service employees to pay union dues to either SMART-TD or to BLET, SMART-TD is the *exclusive* representative of all railroad conductors employed by Union Pacific.  As to railroad conductors, Union Pacific cannot lawfully negotiate collective bargaining agreements with BLET or any other union; nor may Union Pacific negotiate collective bargaining agreements with individual employees.  (Cates Decl., ¶ 7).

6. SMART-TD enjoys the federally conferred status as "exclusive" representative. (Cates Decl., ¶ 8).

7. The collective bargaining agreements between SMART-TD and Union Pacific include express and implied terms. Among those implied terms is the ability of Union Pacific to implement work rules governing the conduct of Union Pacific's union-represented employees. (Cates Decl., ¶ 9).

8. Union Pacific has two work rules that prohibit employees from bringing firearms onto Union Pacific Property: First, Union Pacific, like nearly 400 other railroads, follows the General Code of Operating Rules ("GCOR"). Since at least 2000, GCOR Rule 1.12 has remained unchanged and has provided unambiguously that "[w]hile on duty or on railroad property, employees must not have firearms …" (Cates Decl., ¶ 10, Ex. A).

9. Second, since at least 2003, Union Pacific has maintained a Violence and Abusive Behavior in the Workplace Policy ("Workplace Violence Policy"). The Workplace Violence Policy has been amended from time to time but has consistently prohibited employees, other than Union Pacific Police, from possessing weapons, including firearms, while on Union Pacific property, even if the employee is licensed to carry a concealed handgun under state law. For example, the 2003 Workplace Violence Policy states that "Union Pacific employees … are prohibited from possessing or hiding weapons on their person and their vehicle while on Union Pacific property. This prohibition applies even if the individual is licensed to carry a handgun under state law." (Cates Decl., ¶ 11, Ex. B).

10. The 2015 Workplace Violence Policy states that employees are prohibited from "possessing or hiding weapons in facilities, equipment, or vehicles used in operations while on such property, or on their persons … . This prohibition applies even if the individual is licensed to carry a concealed handgun under state law." (Cates Decl., ¶ 11, Ex. C).

11. Even earlier, Union Pacific enforced its substantially similar "Rule 603" which prohibited employees from having firearms in their possession or while on company property. (Cates Decl., ¶ 11).

12. At no time has SMART-TD successfully challenged Union Pacific's rules prohibiting firearms as a violation of any collective bargaining agreement between SMART-TD and Union Pacific. Nor has SMART-TD negotiated, through collective bargaining, a limitation on Union Pacific's rule in any of the successive collective bargaining agreements that SMART-TD or its predecessors have negotiated. On the contrary, Union Pacific has enforced that prohibition and has successfully defended labor arbitrations involving discipline of Union Pacific conductors who violate Union Pacific's firearms prohibition. (Cates Decl., ¶ 12).

13. In negotiating successive amendments to its collective bargaining agreements with Union Pacific, SMART-TD has acquiesced in Union Pacific's work rule against carrying firearms onto Carrier property. (Cates Decl., ¶ 13).

14. In the case of Mr. Franklin, Union Pacific's firearms prohibition was enforced in the labor arbitration award in which the arbitration panel enforced a year-and-a-half unpaid suspension of Franklin for his admitted violation of Union Pacific's rule. In an Award issued April 20, 2022, the PLB sustained discipline against Franklin and specifically cautioned Franklin that Union Pacific would continue to maintain and enforce its zero-tolerance policy regarding firearms on company premises. By sustaining discipline against Franklin, the arbitration panel necessarily concluded that the collective bargaining agreement agreed to by SMART-TD authorized Union Pacific to prohibit firearms on its property. (Cates Decl., ¶ 14, Ex. D).

15. In the case at bar, Franklin openly acknowledges that his claim seeks a determination, based solely on state law, that Union Pacific cannot enforce the firearm

prohibition that has existed for decades pursuant to collective bargaining agreements with SMART-TD and every other labor union that represents Union Pacific's employees.  (Franklin Counterclaim, D.I. 11).

                Respectfully submitted,

Cynthia W. Kolb, Ark. Bar No. 2000156
ROSE LAW FIRM
120 East Fourth Street
Little Rock, AR  72201
Phone: (501) 377-0382
Fax: (501) 375-1309
ckolb@roselawfirm.com

- and -

Joseph P. Sirbak (admitted *pro hac vice*)
Robert S. Hawkins (admitted *pro hac vice*)
COZEN O'CONNOR
1650 Market Street, Suite 2800
Philadelphia, PA  19103
(215) 665-2000
jsirbak@cozen.com
rhawkins@cozen.com

Michael J. Mills (admitted *pro hac vice*)
Union Pacific Railroad
1400 Douglas Street
Omaha, NE  68179
(402) 544-0441
mjmills@up.com

DATED:   September 27, 2024