IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

UNION PACIFIC RAILROAD COMPANY,    )
                                   )
        Plaintiff,                 )
                                   )    C.A. 4:22-cv-960-LPR
    v.                             )
                                   )
RANDY G. FRANKLIN,                 )
                                   )
        Defendant.                 )

REPLY IN SUPPORT OF UNION PACIFIC
RAILROAD COMPANY'S MOTION FOR SUMMARY
JUDGMENT INTRODUCTION

Union Pacific Railroad Company ("Union Pacific") submits this reply brief in support of its Motion for Summary Judgment based on federal preemption. As demonstrated in Union Pacific's opening brief, application of A.C.A. § 11-5-117 against Union Pacific is preempted by the Railway Labor Act, 45 U.S.C. § 151, *et seq.* (the "RLA") and the ICC Termination Act, 49 U.S.C. § 10501 ("ICCTA"). Because there are no disputed issues of fact as to this motion, we limit Union Pacific's reply to the legal arguments raised in the Response of Plaintiff Randy Franklin ("Franklin").

I.    **UNDISPUTED FACTS**

In opposing Union Pacific's Motion for Summary Judgment, Franklin neglected to include a "separate, short and concise statement of the material facts as to which it contends a genuine dispute exists to be tried," as required by L. Rule 56.1(b). While Franklin included a letter from a SMART-TD representative as an exhibit to his Response, such unsworn and unattested statements are insufficient to oppose a Rule 56 motion. *See Banks v. John Deere & Co.*, 829 F.3d 661, 668 (8th Cir. 2016). Accordingly, all of the facts set forth in Union Pacific's Statement of Undisputed

1

Material Facts, D.I. 54, are deemed admitted pursuant to L. Rule 56.1(c).  Among the facts deemed admitted are:

1) SMART-TD is the exclusive representative of railroad conductors employed by Union Pacific and Union Pacific may not negotiate collective bargaining agreements with individual employes. (SUMF, D.I. 54, ¶ 5).

2) The SMART-TD/Union Pacific collective bargaining agreement includes implied terms, including the ability of Union Pacific to implement work rules governing the conduct of its union-represented employees. (*Id.*, ¶ 7).

3) Since at least 2000, GCOR Rule 1.12 has prohibited employees from having firearms on railroad property. (*Id.*, ¶ 8).

4) Since at least 2003, Union Pacific's Workplace Violence Policy has prohibited employees from possessing firearms on Union Pacific property, even if the employee is licensed to carry a concealed handgun under state law.  (*Id.*, ¶¶ 9, 10).

5) Union Pacific has enforced its firearm prohibition and successfully defended labor arbitrations involving discipline of Union Pacific conductors who violated the prohibition. (*Id.*, ¶ 12).

6) SMART-TD has acquiesced in Union Pacific's work rule against carrying firearms onto Union Pacific's property. (*Id.*, ¶ 13).

7) The Public Law Board hearing Franklin's case necessarily concluded that the collective bargaining agreement agreed to by SMART-TD authorized Union Pacific to prohibit firearms on its property. (*Id.*, ¶ 14).

II. **ARGUMENT**

A. **Arkansas Code § 11-5-117 Is Preempted by the Railway Labor Act.**

1. **The Timing of Union Pacific's Labor Negotiations is Irrelevant.**

Franklin argues that Arkansas law cannot be preempted because Union Pacific's collective bargaining agreement with SMART-TD was negotiated before A.C.A. § 11-5-117 was enacted. However, this very argument was rejected in *Miller v. Southwest Airlines, Inc.*, 926 F.3d 898 (7th Cir. 2019), which held that the timing and content of the labor negotiations were (a) not properly part of the record (as is true here), and (b) not relevant to the legal analysis. As the *Miller* court ruled:

> Plaintiffs stress that Southwest began using workers' fingerprints in 2006, two years before Illinois enacted its law. This shows that the union cannot have consented to Southwest's practices, plaintiffs conclude. That's not necessarily so. Southwest and the union may have discussed and resolved this matter in 2005, or 2006, or 2008, or in the decade since. Perhaps in 2006 Southwest supplied all of the information, and the union gave all of the consents, that the state later required. Perhaps the statute led to a new round of bargaining. What Southwest told the union, whether it furnished that information in writing, when these things happened, and what the union said or did in response, are matters not in this record. *They are properly not in this record, as they are topics for resolution by an adjustment board rather than a judge. Perhaps a board will conclude that the union did not consent or did not receive essential information before consenting, just as plaintiffs assert. But the board must make that decision and supply any appropriate remedy.*

*Miller v. Southwest Airlines, Inc.*, 926 F.3d 898, 904 (7th Cir. 2019) (emphasis supplied).

This reasoning is even more compelling here. First, unlike biometric screening – a subject of recent vintage, the possession of weapons in the workplace has been the subject of rail carrier work rules for many years. Thus, over the decades of its representation of Union Pacific employees, and well before passage of the current Arkansas statute, SMART-TD could – and did – acquiesce to a prohibition of firearms on Union Pacific property. Indeed, the arbitration award submitted in support of Union Pacific's motion for summary judgment strongly supports Union Pacific's position that SMART-TD did exactly that. Any dispute over that contention is within the exclusive jurisdiction of an arbitration board established pursuant to Section 3 of the RLA.

*Consolidated Rail Corp. v. Railway Labor Execs.' Ass'n,* 491 U.S. 299, 302 (1989) ("*Conrail*");

*Brotherhood of Ry. Carmen v. Missouri Pacific R.R. Co.*, 944 F.2d 1422, 1427 (8th Cir. 1991).

Second, Franklin's statement that Union Pacific last engaged in meaningful collective bargaining with SMART-TD prior to 2019 is both wrong and irrelevant. As reflected in the Report of Presidential Emergency Board ("PEB") No. 250, dated August 16, 2022, Union Pacific participated in the round of national railroad collective bargaining negotiations that began in November 2019 with multiple unions including SMART-TD. The Report of Presidential Emergency Board No. 250 is available on the National Mediation Board's website: https://nmb.gov/NMB_Application/wp-content/uploads/2022/08/PEB-250-Report-and-Recommendations.pdf.[1] The 2019 round of national negotiations did not conclude until December 2022, when President Biden signed into law a joint congressional resolution that adopted the recommendations of PEB No. 250.[2]

In short, Franklin's statement that Union Pacific did not engage in meaningful collective bargaining after passage of the 2019 Arkansas statute is demonstrably wrong. More importantly, it is irrelevant. As the *Miller* court reasoned, the evaluation of bargaining proposals is squarely

---

[1] The Court properly may take judicial notice of information published on government websites. *See Missourians for Fiscal Accountability v. Klahr*, 830 F.3d 789, 793 (8th Cir. 2016).

[2] The President created Emergency Board 250 on July 15, 2022, when the national negotiations that began in 2019 failed to produce a ratified collective bargaining agreement. (Report of PEB No, 250 at 9). In order to prevent a nationwide rail strike and exercising his authority under Section 10 of the RLA, the President created an Emergency Board to investigate the dispute and make recommendations for settlement. *See* Exec. Order No. 14077, 87 Fed. Reg. 43, 203 (July 15, 2022). Even after Emergency Board No. 250 issued its report and recommendations for settlement on August 16, 2022, the parties were unable to reach fully ratified agreements. Accordingly, the President signed into law a joint congressional resolution that adopted the recommendations of the Emergency Board and made binding the tentative agreements previously reached by the parties. *See* Pub. L. No. 117-216 , 136 Stat. 2267-2268 (Dec. 2, 2022). *See also Alton & S. Ry. v. Brotherhood of Maint. of Way*, No. 22-7044, 2023 BL 53393, at *3 (D.C. Cir. Feb. 17, 2023).

within the exclusive jurisdiction of the RLA arbitration boards.  Thus, even if the post-2019 collective bargaining record were part of the record, it would not matter.

### 2. Federal Law Governs the Authority of a Union to Negotiate on Behalf of Employees it Represents.

Franklin argues that the State of Arkansas "grants the union no authority to negotiate this matter, and impliedly rejects it." *See* Response, D.I. 60, at 2.  However, it is hornbook law that federal law, not state law, governs the scope of a labor union's authority to negotiate on behalf of the employees represented by the union.  It necessarily follows, then, that any effort by a State to curtail the bargaining authority granted by federal law is preempted. As applied here, there can be no doubt but that the labor unions representing Union Pacific employees have the authority to enter into collective bargaining agreements through which they acquiesce in the railroad's right to establish work rules such as the rules at issue here.  The quasi-legislative scope of a union's authority is established by the Supreme Court's decision in *International Association of Machinists v. Street*, 367 U.S. 740 (1961), and its progeny.  The scope of what is "bargainable" under the RLA is broad; indeed, "the whole idea of what is bargainable has been greatly affected by the practices and customs of the railroads and their employees themselves."  *Order of R.R. Telegraphers v. Chicago & North Western Ry.*, 362 U.S. 330, 338 (1960).  Application of these principles to state laws that purport to limit a union's bargaining authority is squarely addressed in *Miller*: "A state cannot remove a topic from the union's purview and require direct bargaining between individual workers and management. And Illinois did not try." *Miller*, 926 F.3d at 903.

In short, federal law gives SMART-TD the unquestioned ability to bargain for a labor contract that acquiesced in Union Pacific's promulgation of work rules that prohibit firearms on carrier property.  Arkansas law did not, and could not, alter that authority.

5

### 3. The *Conrail* Decision Establishes the Standard for Deciding Whether a Dispute is a "Minor" Dispute Subject to Arbitration.

Franklin appears to dispute the legal proposition that if a railroad has an "arguable" basis for its interpretation of a collective bargaining agreement, any dispute over that interpretation is a "minor dispute" subject to mandatory arbitration. Franklin states: "However, the word 'arguable' while appearing in quotes, is not in the opinion cited. These do not appear to be the basis for the court's opinion." Response, D.I. 60, at 3.

On this point, the Eighth Circuit Court of Appeals' recitation of the *Conrail* standard is dispositive:

> The distinction between major and minor disputes rests on whether "the terms of an existing agreement either establish or refute the presence of a right to take the disputed action." *Consolidated Rail*, 109 S.Ct. at 2481. In *Consolidated Rail*, the Supreme Court approved the standard employed by various courts of appeal to determine whether a dispute is major or minor, stating: 'Where an employer asserts a contractual right to take the contested action, the ensuing dispute is minor if the action is arguably justified by the terms of the parties' collective-bargaining agreement. Where, in contrast, the employer's claims are frivolous or obviously insubstantial, the dispute is major.' *Id.* at 2482.
>
> Under this standard, the employer has the burden of establishing that its claims are not frivolous or obviously insubstantial, *Id*. at 2482, 2489, but the burden is 'relatively light.' *Id*. at 2482. The court's role, thus, is not to interpret the agreement, but merely to determine whether the case 'implicates a question of contract interpretation.' *Sheet Metal Workers Int'l Ass'n v. Burlington N. R.R.*, 893 F.2d 199, 203 (8th Cir.1990) (*quoting International Ass'n of Machinists v. Soo Line R.R. Co.*, 850 F.2d 368, 376 (8th Cir.1988) (*en banc*).

*Bhd. Ry. Carmen v. Mo. Pac. R.R.*, 944 F.2d 1422, 1427 (8th Cir. 1991).

Under this standard, if Union Pacific's interpretation of its collective bargaining agreement with SMART-TD is "not frivolous or obviously insubstantial" then any dispute over that interpretation is a minor dispute subject to the exclusive jurisdiction of an RLA arbitration panel. In this regard, the collective bargaining agreement includes not only the written text of the agreement, but also implied terms established through past practice and course of dealing. As

noted in the *Conrail* decision, the text of Conrail's collective bargaining agreement was not even part of the record before the Supreme Court.  *Conrail*, 491 U.S. at 311 ("Neither party relies on any express provision of the agreement; indeed, the agreement is not part of the record before us. As the parties acknowledge, however, collective-bargaining agreements may include implied, as well as express, terms.").  The Court ruled that the dispute was minor based solely on Conrail's non-frivolous interpretation of its past practice, to which its unions had acquiesced, of requiring employees to submit to medical inquiries when returning to work after an extended absence.

> **4.** **Any Dispute Over Union Pacific's Interpretation of its Collective Bargaining Agreement is a Minor Dispute Under the RLA. Therefore, Application of A.C.A. § 11-5-117 is Preempted by the RLA.**

At bottom, Franklin's argument is that Arkansas law supersedes the RLA, a federal law that mandates arbitration of disputes concerning the interpretation or application of railroad collective bargaining agreements.  For that proposition, Franklin argues that Union Pacific's collective bargaining agreements cannot supersede state laws permitting employees to carry firearms, any more than they could bar application of state "minimum wage" laws.  However, apparently to Franklin's surprise, federal law does indeed completely preempt the application of state wage and hour laws to railroad employees.  On this very point, the Seventh Circuit has ruled that "Congress has so occupied the field of railway regulation that Illinois's overtime law is preempted as applied to the railways."  *Wisconsin Central, Ltd. v. Shannon*, 539 F.3d 751, 755 (7th Cir. 2008).

Similarly, the preemption analysis in *Miller* is directly on point and shows that, where a labor organization has arguably exercised its authority, as the exclusive representative of employees, to give consent or to waive workplace rights that employees might otherwise enjoy under state law – whether it is use of biometric data or a prohibition of firearms in the workplace

7

– then application of the state statute is preempted.  None of the arguments made in Franklin's brief warrant a different conclusion.

> **B.      Franklin's Rationale for Why Arkansas Law Does Not Discriminate Against Rail Carriers Fundamentally Misconstrues the Unique Liability Scheme Imposed by FELA on Rail Carriers.**

In its opening brief, Union Pacific argued that, because Arkansas law operates to impose potentially catastrophic liability on FELA-covered rail carriers alone, Arkansas' statutory scheme requiring employers to permit firearms in their parking lots discriminates against rail carriers and therefore is preempted by the ICC Termination Act,  49 U.S.C. § 10501(b) ("ICCTA").  Franklin counters that Arkansas law does not "discriminate" against rail carriers in contravention of ICCTA because other industries are similarly situated. *See* Response, D.I. 60 at 6 ("In Arkansas we have airplanes, telecommunication companies, natural gas companies, oil companies, and a nuclear reactor").  FELA applies solely to rail carriers.  *See* 45 U.S.C. § 51 (creating liability on behalf of "[e]very common carrier by railroad").  Unlike workers' compensation statutes that impose fixed, scheduled damages determined through a state administrative proceeding, FELA affords plaintiffs a trial by jury and damages are uncapped.  "Congress intended the FELA to be a broad, remedial statute, and courts have adopted a standard of liberal construction to facilitate Congress' objectives."  *Ackley v. Chi. & N. W. Transp. Co.*, 820 F.2d 263, 266 (8th Cir. 1987).

> The statute supplants [the common law duty of master to servant] with the far more drastic duty of paying damages for injury or death at work due in whole or in part to the employer's negligence. The employer is stripped of his common-law defenses and for practical purposes the inquiry in these cases today rarely presents more than the single question whether negligence of the employer played any part, however small, in the injury or death which is the subject of the suit. The burden of the employee is met, and the obligation of the employer to pay damages arises, when there is proof, even though entirely circumstantial, from which the jury may with reason make that inference.

*Id.* (quoting *Rogers v. Missouri Pac. R.R.*, 352 U.S. 500, 507-08 (1956)).

In speculating that "a [FELA] case could not move forward where the basis of liability was that the company was following the law," Response, D.I. 60, at 7-8, Franklin misconstrues the nature of FELA liability. Because FELA strips an employer of common-law defenses and liability turns on "negligence of the employer … however small," a rail carrier arguably could be found liable for being negligent in some manner other than allowing employees to bring their firearms onto the parking lot. This stands in stark contrast to the protection afforded to every other Arkansas employer by A.C.A. § 16-120-802, which exempts employers from liability "for damages, injuries, or death resulting from or arising out of an employee's or another person's **actions involving a handgun transported or stored under § 11-5-117** … unless the … employer intentionally solicited or procured the other person's actions." To take a simple hypothetical, if an employee brings a handgun to the employer's parking lot and decides to resolve a heated workplace argument by retrieving the gun and shooting a co-worker, virtually all Arkansas employers would enjoy **complete** immunity, solely because the incident "involve[ed] a handgun transported or stored under § 11-5-117." *See* A.C.A. § 16-120-802. Franklin's point is that, in the same hypothetical, a rail carrier covered under FELA likely would defeat a claim that it was negligent for the discrete act of allowing the gun onto the property. However, a rail carrier still could be found negligent under FELA if a jury concluded that it was negligent in some other way, for example by failing to recognize that an employee presented a risk of workplace violence in the first place. *See Armstrong v. Burlington N. R.R.*, 139 F.3d 1277 (9th Cir. 1998) (reversing grant of summary judgment against employee who brought a FELA suit after being assaulted and threatened with being shot at work because the carrier possibly "could have prevented the assault by watching the assailant more closely or terminating him before the assault occurred"); *Mullahon v. Union Pac. R.R. Co.*, 64 F.3d 1358, 1362-64 (9th Cir. 1995) (allowing FELA claim by the estate of an employee murdered in a

9

workplace shooting to proceed to a jury trial on the theory that a co-worker was aware of facts that could have made the shooting reasonably foreseeable).  Arkansas law is incapable of conferring the same plenary immunity on rail carriers that it bestows upon other employers.

Federal law may heavily regulate the operations of the other industries that Franklin cites, but liability for workplace injuries and fatalities remains governed by state law. Airlines, for example, are covered by the Railway Labor Act for purposes of collective bargaining, but workplace injuries and fatalities remain regulated through Arkansas workers' compensation law. *See, e.g., Montgomery v. Delta Airlines*, 31 Ark. App. 203, 791 S.W.2d 716 (Ark. Ct. App. 1990). Arkansas workers' compensation law also covers nuclear facilities, *see Wackenhut Corp. v. Jones*, 73 Ark. App. 158, 40 S.W.3d 333 (Ark. Ct. App. 2001); telecommunications providers, *see Ritter Communications v. Rhea*, C.A. 07-563, 2007 WL 4424999 (Ark. Ct. App. Dec. 19, 2007); pipelines, *see Barnett v. Natural Gas Pipeline Co.*, 62 Ark. App. 265, 970 S.W.2d 319 (Ark. Ct. App. 1998); and oil companies, *see Gentry v. Arkansas Oil Field Servs.*, 2011 Ark. App. 786 (Ark. Ct. App. 2011).

Citing 49 U.S.C. § 31138, Franklin claims that motor carriers and shippers also are subject to "FELA type statutes."  Response, D.I. 60, p.7. He is incorrect. The cited code section requires the Secretary of Transportation to impose minimum levels of financial responsibility for liabilities arising from the transportation of passengers. 49 U.S.C. § 31138(a). Motor vehicle operators must establish evidence of financial responsibility – through insurance, self-retention, guarantee, or surety bond – in an amount that varies depending on the number of passengers transported. 49 U.S.C. § 31138(b), (c). The provision that Franklin relies upon is akin to a state law requiring drivers to maintain some minimum level of liability insurance; it does not create liability under federal law remotely analogous to FELA.

The Jones Act, 46 U.S.C. § 30104, does extend the FELA tort scheme to cover seamen. Of course, the Jones Act covers only an extraordinarily narrow class of "sea-based maritime employees whose work regularly exposes them to the special hazards and disadvantages to which they who go down to sea in ships are subjected." *Smith v. Marine Terminals of Ark., Inc.*, C.A. 3:09-cv-00027-JLH, 2010 WL 4789167, * 3-4 (E.D. Ark. Nov. 17, 2010) (holding that a land-based employee responsible for unloading barges from a floating river-bank dock was not a Jones Act covered seaman). Others engaged in maritime employment are covered by the Longshore and Harbor Workers' Compensation Act, 33 U.S.C. § 901, *et seq.*, a workers' compensation statute, and are barred from bringing suit against their employers in tort. *See id.* at * 5. The fact that entities discriminated against by § 11-5-117 could include employers of seamen in Arkansas, to the extent there presently are any such employers, in no way undermines Union Pacific's argument that § 11-5-117 discriminates against it as a FELA-covered rail carrier.

In addition, Franklin claims that ICCTA cannot preempt § 11-5-117 because ICCTA applies only to "train stuff."  *See* Response, D.I. 60, p.7 ("… Defense Counsel cannot find a single case that does not cover 'train stuff'"). Union Pacific's opening brief described just such a case. *Vermont Ry., Inc. v. Town of Shelburne*, 287 F.  Supp. 3d 493 (D. Vt. 2017) found preempted an ordinance passed pursuant to a town's police powers with the stated aim of protecting the health, safety, and welfare of its citizens. *Id.* at 497. In setting a maximum quantity of particular substances that could be stored at a facility, the ordinance applied to all facilities in the town and did not reference rail carriers. *Id.* at 497-98. But because the cap effectively would restrict only the railroad (the town's road salt storage shed fell below the cap), the Court held that it discriminated against the railroad and fell within ICCTA's sweeping preemptive force. *Id.* at 500-01.

ICCTA preempts all sorts of generally-applicable state and local statutes. One example is zoning regulation. A city's 35-foot building height limitation was preempted to the extent it would restrict a rail carrier's construction of 85-foot tall silos for transloading sand. *See Texas Cent. Business Lines Corp. v. City of Midlothian*, 669 F.3d 525, 532-33 (5th Cir. 2012). City regulation of the grading of roads and a requirement that roads be paved in concrete likewise are preempted by ICCTA. *See id.* at 533-34. So is a city's enforcement of a generally-applicable noise ordinance, when applied to rail carrier operations. *See Norfolk S. Ry. Co. v. City of Maple Heights*, C.A. 1:02-cv-1468, 2003 WL 26100887, * 5-6 (N.D. Ohio, May 14, 2003).  Building height limits, minimum construction requirements for private roads, and noise ordinances are adopted by municipalities around the country and do not involve "train stuff."  Although such ordinances are not aimed specifically at railroads, they nevertheless have been found preempted based on their **effect**. "Limiting preemption to state laws aimed specifically at railroad regulation would arbitrarily limit the purposefully broad language chosen by Congress in the ICCTA." *Wisconsin Cent. Ltd. v. City of Marshfield*, 160 F. Supp. 2d 1009 (W.D. Wis. 2000).

Finally, the Arkansas General Assembly was not blind to the impact that A.C.A. § 11-5-117 would have on rail carriers. In fact, at least with respect to the General Assembly's 2021 amendments, the Arkansas Supreme Court noted in its opinion that the General Assembly was "[i]nspired by Franklin's plight."  *See* Certified Question Answer, D.I. 31-1 at 2. Franklin's union elaborates that:

> The General Assembly explicitly amended the law in question in reaction to Union Pacific's rules and policies regarding this issue. Ultimately, it protects all employees across the state. Yet, I must reiterate that the law was created to react to Union Pacific's rules and policies and their overall disregard for State law.

Unsworn Letter of Gerald Sale, D.I. 60-1. By Franklin's own account, the Arkansas statutory scheme does not merely incidentally touch upon Union Pacific – it was specifically *intended* to apply to Union Pacific.

Arkansas law imposes an undue burden on rail carriers that is not imposed on other employers. Section 11-5-117 discriminates against FELA-covered rail carriers and therefore is preempted by ICCTA.

## III.    CONCLUSION

As a matter of law, the Railway Labor Act and ICC Termination Act preempt § 11-5-117, bringing this litigation to an end.  Union Pacific respectfully requests that the Court (i) grant its Motion for Summary Judgment, (ii) declare that § 11-5-117 is preempted, as applied to Union Pacific, by the Railway Labor Act, (iii) declare that § 11-5-117 is preempted, as applied to Union Pacific, by the ICC Termination Act, (iv) enter a permanent injunction prohibiting Defendant Franklin (directly, and through any agent or attorney representing him) from initiating a legal action under A.C.A. § 16-118-115 against Union Pacific, in any state or federal forum, (v) dismiss with prejudice Franklin's counterclaim against Union Pacific, and (vi) grant such further relief as may be just and proper.

Respectfully submitted,

Cynthia W. Kolb, Ark. Bar No. 2000156
ROSE LAW FIRM
120 East Fourth Street
Little Rock, AR  72201
Phone: (501) 377-0382
Fax: (501) 375-1309
ckolb@roselawfirm.com

- and –

13

Joseph P. Sirbak (admitted *pro hac vice*)
Robert S. Hawkins (admitted *pro hac vice*)
COZEN O'CONNOR
1650 Market Street, Suite 2800
Philadelphia, PA  19103
(215) 665-2000
jsirbak@cozen.com
rhawkins@cozen.com

Michael J. Mills (admitted *pro hac vice*)
Union Pacific Railroad
1400 Douglas Street
Omaha, NE  68179
(402) 544-0441
mjmills@up.com