**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**CENTRAL DIVISION**

**UNION PACIFIC RAILROAD COMPANY** — **PLAINTIFF/ COUNTER-DEFENDANT**

**v.** **Case No. 4:22-cv-00960-LPR**

**RANDY G. FRANKLIN and BENJAMIN CRAIG** — **DEFENDANTS/ COUNTER-CLAIMANTS**

**STATE OF ARKANSAS** — **INTERVENOR**

# ORDER

This is a gun-rights case. But it is not a usual one. It does not implicate the Second Amendment, at least not directly. Instead, this case asks whether federal laws concerning the operations of railroads prevent this Court from enforcing against a railroad a generally applicable gun-rights law adopted by the State of Arkansas. To cut to the chase, the answer is no.

Arkansas law gives every Arkansan a protectable right to keep a legally owned firearm in his or her locked car on his or her employer's property during work.[1] Union Pacific believes that federal law either preempts the application of Arkansas's law to railroads or deprives this Court of jurisdiction over disputes between a railroad and its employees concerning the law.[2] Two Union Pacific employees believe otherwise.[3]

As will be further explained below, Union Pacific and the employees have each brought suit against the other.[4] And today's Order addresses Union Pacific's Motion for Summary

[1] *See generally* Ark. Code Ann. § 11-5-117. To be clear, the law's protections only apply where an employer otherwise allows its employees to park on company property during work. The upshot is that an employer can't generally allow employees to park on its property but then prevent employees from having guns in their locked cars.

[2] *See generally* Pl.'s Mem. in Supp. Summ. J. (Doc. 53).

[3] *See generally* Defs.' Resp. to Summ. J. (Doc. 60).

[4] *See generally* Second Am. Compl. (Doc. 82); Answer and Countercl. to Second Am. Compl. (Doc. 83).

Judgment on both suits.[5]

Union Pacific first asks this Court to rule—as a matter of law—that application of the Arkansas statute to railroads is preempted by the Interstate Commerce Commission Termination Act.[6] In the alternative, Union Pacific ask this Court to rule—as a matter of law—that the Railway Labor Act either preempts the Arkansas statute as applied to railroads or requires the dispute presented by the parties be heard by the National Railroad Adjustment Board.[7] For the reasons discussed below, the Court DENIES the Motion.

**THE STATE LAWS AT ISSUE**

In 2017, the Arkansas General Assembly passed (and the Arkansas Governor signed) Act 1071.[8] The Act "reinforce[d] and protect[ed] the right of each citizen to lawfully transport and store a handgun within his or her private motor vehicle for lawful purposes in any place where the private motor vehicle is otherwise permitted to be located."[9] It did so in the following ways.

The Act amended a pre-existing statutory rule concerning where a person with a concealed-carry permit could and could not carry a handgun. Under the pre-existing rule, a person with a concealed-carry permit could not carry a handgun onto property where the property owner had placed a sign prohibiting the carrying of handguns.[10] Act 1071 excepted from this rule "[a] parking lot of a private employer" when the gun was stored out of sight, inside a locked

---

[5] *See generally* Pl.'s Mot. for Summ. J. (Doc. 52).

[6] *See id.* ¶ 3.

[7] *See id.* ¶ 2; Pl.'s Mem. in Supp. Summ. J. (Doc. 53) at 13–18.

[8] *See* Act of Apr. 6, 2017, No. 1071, 2017 Ark. Acts 1071.

[9] *Id.* § 1 (not codified).

[10] *Id.* § 2.

personal handgun storage container, and inside the person's own locked private motor vehicle.[11] The Act also went on to affirmatively provide that "[a] private employer shall not prohibit an employee who is a [concealed-carry permit holder] from transporting or storing a legally owned handgun in the employee's private motor vehicle in the private employer's parking lot" if the gun was stored out of sight, inside a locked personal handgun storage container, and inside the person's own locked private motor vehicle.[12] The Act emphasized that, in such circumstances, "[a] private employer shall not prohibit or attempt to prevent an employee who is a [concealed-carry permit holder] from entering the parking lot of the private employer's place of business because the employee's private motor vehicle contains a handgun . . . ."[13]

Act 1071 also did certain other things that are important to this case. For one thing, the Act provided a cause of action for an employee to sue an employer who violates the statutory prohibitions described above.[14] The affected employee can sue for damages, attorney's fees, and equitable relief.[15] For another thing, the Act largely immunized private employers from civil liability resulting from or arising out of an employee's or other person's actions involving guns stored under the Act.[16] This immunity provision—although it is tangential to the parking-lot-gun-rights provision directly at issue—plays an outsized role in the instant litigation. There will thus be more to come below on the immunity provision. But for now, let's fast forward four years.

---

[11] *Id.* §§ 2–3.

[12] *Id.* § 3.

[13] *Id.*

[14] *Id.* § 4.

[15] *Id.*

[16] *Id.* § 5.

In 2021, the Arkansas General Assembly passed (and the Arkansas Governor signed) Act 809.[17] This Act made three principal changes to the 2017 law: (1) it did away with the requirement that an employee have a concealed-carry permit in order to avail himself of the parking-lot-gun-rights provision; (2) it broadened the applicable protection to cover all firearms; and (3) it removed the requirement that the firearm be kept in a "locked personal handgun storage container[.]"[18] The 2021 Act did not materially alter any other aspects of the 2017 Act.[19]

The currently operative parking-lot-gun-rights provision is codified at Arkansas Code Annotated Section 11-5-117. The currently operative cause-of-action provision is codified at Arkansas Code Annotated Section 16-118-115. And the currently operative liability-immunity provision is codified at Arkansas Code Annotated Section 16-120-802(a). In the remainder of this Order, the Court will refer to these provisions either by name or code section number.

**THE RUN-UP TO LITIGATION**

There are currently two individuals in this case facing off against Union Pacific. But only Mr. Franklin has been in it from the start. The parties dispute Mr. Franklin's current employment status, but everyone at least agrees he was—for a very long time—an employee of Union Pacific and a member of his union, the International Association of Sheet Metal, Air, Rail, and Transportation Workers – Transportation Division.[20]

---

[17] *See* Act of Apr. 21, 2024, No. 809, 2021 Ark. Acts 809.

[18] *Id.* §§ 1–3.

[19] *See id.* §§ 4–5. The only amendments to the liability-immunity provision (discussed at page 3, *supra*) and the cause-of-action provision (discussed at page 3, *supra*) are changes to code section citations.

[20] *See* Second Am. Compl. (Doc. 82) ¶ 1. Union Pacific asserts that Mr. Franklin is a former employee. *Id.* ¶ 12. However, Mr. Franklin asserts that he "is still considered an employee during the appeal of his termination." *See* Answer and Countercl. to Second Am. Compl. (Doc. 83) ¶ 12. The Court understands the termination (or potential termination) that the parties dispute has nothing to do with the Arkansas law at issue in this case. *See* Second Am. Compl. (Doc. 82) ¶ 55.

On August 3, 2020, Mr. Franklin arrived at work with a handgun in his vehicle.[21] Mr. Franklin believed that the 2017 Arkansas law allowed him to do this.[22] Union Pacific disagreed. In Union Pacific's view, an employee bringing a firearm onto railroad property violated Union Pacific's policies; so, Union Pacific terminated Mr. Franklin from employment.[23] Eventually, after Mr. Franklin's union appealed Union Pacific's action to the Public Law Board, the termination was reduced to a suspension without pay by the Board.[24] This reduction in discipline was based on Mr. Franklin's "length of service and good record[.]"[25] Despite the reduction, however, the Board emphasized to Mr. Franklin that "it remains the firm position of [Union Pacific] that bringing a firearm on property, even if stowed in a locked vehicle, continues to not be permitted."[26] The Board reiterated that Union Pacific made clear that "it intends to not waiver in its position that [its policies] of zero tolerance with regard to possessing firearms in facilities, equipment[,] or vehicles on company premises[] will continue to be maintained and enforced."[27]

Mr. Franklin returned to work for Union Pacific in July of 2022.[28] Unsurprisingly,

---

[21] *See* Second Am. Compl. (Doc. 82) ¶ 1.

[22] *See* Ex. 1 to Second Am. Compl. (Doc. 82-1) at 4–5.

[23] *See id.* at 1–2.

[24] *See id.* at 2, 5.

[25] *Id.* at 5.

[26] *Id.* at 6.

[27] *Id.*

[28] *See* Answer and Countercl. (Doc. 11) ¶ 37. Union Pacific asserted in its original Complaint and its Second Amended Complaint that Mr. Franklin returned to work "on or around March 31, 2022." *See* Compl. (Doc. 1) ¶ 37; Second Am. Compl. (Doc. 82) ¶ 47. In his original Answer and Counterclaim, Mr. Franklin disputed this fact on the basis that it was impossible for Mr. Franklin to have returned to work on March 31, 2022, because the Board's decision to reinstate Mr. Franklin did not occur until April 20, 2022, three weeks after that date. *See* Answer and Countercl. (Doc. 11) ¶ 37. The Court noted this discrepancy in its September 26, 2023 Order and concurred that Union Pacific's allegation of the return-to-work date was suspect. *See* Doc. 26 at 4 n. 16. However, in Mr. Franklin's Answer and Counterclaim to the Second Amended Complaint, he admitted this fact. *See* Answer and Countercl. to Second Am.

Mr. Franklin still wanted to bring his firearm and keep it out of sight, in his locked car, in Union Pacific's parking lot.[29] In September of 2022, Mr. Franklin's attorney sent Union Pacific a letter asking the company to "clarify its position in view of recently enacted [2021] Arkansas legislation."[30] The letter explained that, "[i]n view of these legislative developments, Mr. Franklin's position is that Union Pacific's policy [of prohibiting firearms in company parking lots] would run afoul of [Arkansas law]."[31] The letter sought assurances that Union Pacific agreed with Mr. Franklin's position.[32] The letter also threatened—or at least could reasonably be read to threaten—legal action if Union Pacific did not agree with Mr. Franklin's position.[33]

**LITIGATION BEGINS**

Instead of waiting for the likely lawsuit from Mr. Franklin, Union Pacific filed a declaratory judgment action in federal court.[34] In its original Complaint, Union Pacific sought a declaration that "Ark. Code Ann. § 11-5-117 is preempted by the Federal Employers' Liability Act to the extent that it would apply to Union Pacific parking lots located in Arkansas[.]"[35] Recall that Section 11-5-117 is the parking-lot-gun-rights provision. Union Pacific's attack on this provision was less of a direct attack and more of a bankshot. Union Pacific's argument went as follows: (1) as applied to railroad companies, FELA directly preempts the liability-immunity

Compl. (Doc. 83) ¶ 47. For the purposes of the dispositive legal question, Mr. Franklin's date of his return to work is irrelevant, but the Court notes the discrepancy in this fact for the record. The Court uses the July 2022 date in this Order because it logically makes the most sense based on the known sequence of events.

[29] *See* Second Am. Compl. (Doc. 82) ¶ 49.

[30] Ex. 2 to Compl. (Doc. 1) at 20.

[31] *Id.* at 22.

[32] *Id.*

[33] *See id.*

[34] *See generally* Compl. (Doc. 1).

[35] *Id.* ¶ 54(a).

provision codified at Section 16-120-802(a); and (2) because Section 16-120-802(a) is not severable from Section 11-5-117 (the parking-lot-gun-rights provision), the preemption of Section 16-120-802(a) automatically renders Section 11-5-117 void or inapplicable.[36]

Mr. Franklin answered the original Complaint and brought a Counterclaim seeking damages and injunctive relief for Union Pacific's alleged violation of the parking-lot-gun-rights provision of Arkansas law.[37] Union Pacific filed a Motion to Dismiss Mr. Franklin's Counterclaim.[38] For purposes of the Motion, both parties accepted that FELA preempted the liability-immunity provision codified at Section 16-120-802(a). But the parties strongly contested whether preemption of the liability-immunity provision led ineluctably to the preemption of Section 11-5-117.[39] The Court certified to the Arkansas Supreme Court the question of whether the two sections were severable.[40] The Arkansas Supreme Court accepted the question,[41] and ultimately held that (1) Section 11-5-117 is "not dependent on the liability-immunity provisions of [S]ection 16-120-802[;]" and (2) "therefore, if the latter is preempted by [FELA], [S]ection 11-5-117 is not likewise preempted."[42] Once the case returned to federal court, this Court (after allowing for input from the parties) denied Union Pacific's Motion to Dismiss based on the Arkansas Supreme Court's answer to the certified question.[43]

---

36 *Id.* ¶¶ 49–52.

37 *See* Answer and Countercl. (Doc. 11) ¶ 65.

38 *See generally* Pl.'s Mot. to Dismiss (Doc. 14).

39 *See generally* Def.'s Resp. to Pl.'s Mot. to Dismiss (Doc. 16).

40 *See* Certified Question Answered, *Union Pacific R.R. Co. v. Franklin*, No. CV-23-653, at *3–4 (Ark. May 2, 2024) (Doc. 34).

41 *See id.* at *3.

42 *Id.* at *4.

43 *See* Aug. 19, 2024 Text Order (Doc. 39).

One might have thought that the litigation would end there because Union Pacific's only theory of preemption had been rejected by the Arkansas Supreme Court and, consequently, by this Court. But one would be wrong. Instead, Union Pacific moved for leave to file an amended complaint.[44] And because there was no objection from Mr. Franklin, the Court granted the request on August 28, 2024.[45] Thus, this case moved to what we can call phase two of the litigation.

Union Pacific's First Amended Complaint asserted two brand new theories regarding its request for a declaratory judgment. First, Union Pacific asserted preemption by way of the ICCTA.[46] Although ICCTA preemption can be triggered for various reasons, Union Pacific claimed ICCTA preemption for one reason only: that the "ICCTA impliedly preempts state laws that 'discriminate against railroads.'"[47] According to Union Pacific, "[a]s construed by the Arkansas Supreme Court . . . , Arkansas's statutory regime discriminates against railroads by requiring them—and only them—to allow employees to bring firearms onto company property without fully protecting them from resulting civil liability."[48]

How did Union Pacific reach this conclusion? Union Pacific noted that (1) the liability-immunity provision codified at Section 16-120-802(a) and the parking-lot-gun-rights provision codified at Section 11-5-117 are severable, and (2) as everyone agrees, Arkansas's liability-immunity provision is preempted by FELA because the Arkansas Legislature cannot immunize Union Pacific from federal civil liability under FELA.[49] Accordingly, Union Pacific

---

[44] *See* Mot. for Leave to File Am. Compl. (Doc. 42).

[45] *See* Aug. 28, 2024 Text Order (Doc. 43).

[46] *See* First Am. Compl. (Doc. 47) at 10–12.

[47] *See id.* ¶ 19 (quoting *Norfolk S. Ry. v. Dille Rd. Recycling, LLC*, 94 F.4th 517, 526 (6th Cir. 2024)).

[48] *Id.* ¶ 61.

[49] *Id.* ¶¶ 57–59.

argued, Arkansas law requires Union Pacific to comply with the requirements of Section 11-5-117 "without the full liability protection from negligence claims that every other private employer in the state enjoys."[50] That means, in very broad strokes, while every other private employer is given near-blanket immunity for problems associated with firearms brought onto its property under the auspices of the parking-lot-gun-rights provision, railroads in Arkansas would not have this immunity where the problem was caused by the negligence (or worse) of their officers, agents, employees or equipment.[51] The bottom line according to Union Pacific was this: since railroads are denied the immunity every other Arkansas employer gets under Section 16-120-802(a), but still have to comply with Section 11-5-117 like every other Arkansas employer, the overall statutory scheme discriminates against railroads and is preempted by the ICCTA.[52]

The second preemption theory Union Pacific asserted in its First Amended Complaint was based on the Railway Labor Act.[53] The First Amended Complaint alleged that Section 11-5-117 "is preempted by the RLA to the extent it would purport to allow an employee to bring a firearm onto a Union Pacific parking lot" because doing so "would violate . . . [existing] collective bargaining agreements . . . ."[54] Union Pacific said that the RLA prevents a state from removing this issue from the set of issues that are subject to collective bargaining between railroads and

---

[50] *Id.* ¶ 59.

[51] *Compare* Ark. Code Ann. § 16-120-802(a), *with* 45 U.S.C. § 51. There are nuances here to each statute. For one example, Arkansas does not immunize intentional conduct of the employer. *See* Ark. Code Ann. § 16-120-802(a). For another, FELA's exact language is slightly different than the Court's paraphrase above. *See* 45 U.S.C. § 51. But these nuances are not relevant to the questions before the Court today.

[52] First Am. Compl. (Doc. 47) ¶¶ 61–63.

[53] *Id.* at 12–14.

[54] *Id.* ¶ 69.

unions.[55] And Union Pacific said that, in this particular case, the provisions of the operative collective bargaining agreement show that its employees (including Mr. Franklin) agreed to the Union Pacific rule against having firearms on Union Pacific property and thus waived any state law right to possess a firearm in Union Pacific's parking lot.[56]

Union Pacific was not just making a straight preemption claim. In addition, although relatedly, Union Pacific asserted that any dispute about the applicability of the parking-lot-gun-rights provision to Union Pacific employees could not be heard by this Court.[57] More specifically, Union Pacific asserted that any claim that Mr. Franklin has not consented to Union Pacific's rule against firearms on property would require an interpretation of the collective bargaining agreement.[58] And that would make this case something called a "minor dispute" under the RLA, which the RLA expressly requires be heard by an adjustment board or arbitration panel.[59]

**MORE PLAYERS ENTER THE SCENE**

Well into the life of this litigation—actually on the same day that Union Pacific filed its First Amended Complaint—Mr. Franklin filed a Motion for Preliminary Injunction. His Motion sought to immediately enjoin Union Pacific from preventing him from bringing his firearm into Union Pacific's parking lot.[60] In its Response, Union Pacific for the first time contended that Mr. Franklin was no longer employed by the railroad.[61] The Court denied the Motion for

---

[55] *See* Pl.'s Mem. in Supp. Summ. J. (Doc. 53) at 12.

[56] First Am. Compl. (Doc. 47) ¶ 69.

[57] *Id.* ¶ 70.

[58] *Id.*

[59] *Id.* Mr. Franklin answered the First Amended Complaint and asserted the same Counterclaim as before. *See generally* Answer and Countercl. to First Am. Compl. (Doc. 56).

[60] *See* Mot. for Prelim. Inj. (Doc. 44) at 1.

[61] *See* Pl.'s Mem. in Opp. to Mot. for Prelim. Inj. (Doc. 55) at 6–7.

Preliminary Injunction on this basis alone.[62] In so doing, the Court alluded to the fact that, if Mr. Franklin was not employed by Union Pacific, there was likely no longer a live controversy requiring judicial resolution between the parties and this case was moot.[63]

To remedy this issue, Union Pacific once again sought to amend its complaint—this time to add Mr. Benjamin Craig as a Defendant.[64] Mr. Craig is a current employee of Union Pacific and member of the Brotherhood of Locomotive Engineers and Trainmen.[65] He wants to store his firearm in his locked vehicle in the parking lot of Union Pacific.[66] Without any objection, the Court granted this request.[67] Once again, Mr. Franklin—and now also Mr. Craig—answered the new Complaint and asserted a Counterclaim against Union Pacific under the Arkansas statute at issue.[68]

At some point during the course of all of this litigation maneuvering, Union Pacific had filed a Motion for Summary Judgment as to its Complaint and any Counterclaim against it.[69] By agreement of the parties, the Court held off deciding that Motion until the new pleadings had been finalized and all parties agreed that they were ready for resolution of the Motion.[70] After the parties informed the Court they were ready for resolution of the Motion, the Court held oral

---

62 *See* Mar. 12, 2025 Text Order (Doc. 76).

63 *See id.*; *see also* Notice (Emails from Chambers to the Parties) (Doc. 75); Pl.'s Resp. to Suggestion of Mootness (Doc. 74).

64 *See generally* Mot. for Leave to File Second Am. Compl. (Doc. 79).

65 *See* Second Am. Compl. (Doc. 82) ¶ 13.

66 *See* Mot. for Leave to File Second Am. Compl. (Doc. 79) at 2.

67 *See* May 29, 2025 Text Order (Doc. 81).

68 *See generally* Answer and Countercl. to Second Am. Compl. (Doc. 83).

69 *See* Pl.'s Mot. for Summ. J. (Doc. 52).

70 *See* May 29, 2025 Text Order (Doc. 81).

argument.[71]

There is one final quirk to all this. Because Union Pacific has raised federal preemption arguments that would prohibit some enforcement of an Arkansas law, the Court—pursuant to Federal Rule of Civil Procedure 5.1(b) and 28 U.S.C. § 2403—invited the State of Arkansas to intervene.[72] Subsequently, the State of Arkansas moved to intervene and no party objected.[73] The Court granted the intervention motion and gave the State the opportunity to brief and argue the summary judgment questions.[74] With all interested parties having written and said whatever there is to write and say on the summary judgment topics, the Court is now ready to rule.

**ICCTA PREEMPTION**

The ICCTA vests the Surface Transportation Board with broad jurisdiction over rail carriers.[75] That jurisdictional grant has been read to expressly or impliedly preempt many state statutes.[76] But STB jurisdiction, and its preemptive penumbra, is not infinite. Generally speaking, the STB jurisdiction provided under 49 U.S.C. § 10501(b) preempts three buckets of state statutes.[77] This case does not concern the first two buckets, and no one has argued

---

[71] *See* Notice (Doc. 88) at 1; Oct. 14, 2025 Text Order (Doc. 89); Mar. 20, 2026 Text Order (Doc. 90).

[72] *See* Sept. 9, 2024 Text Order (Doc. 51).

[73] *See* Mot. to Intervene by State of Arkansas (Doc. 64); Nov. 8, 2024 Text Order (Doc. 66) (requesting that the parties file a response in opposition to the Motion to Intervene by November 12, 2024, or the motion would be granted).

[74] *See* Nov. 18, 2024 Text Order (Doc. 68).

[75] 49 U.S.C. § 10501(b) ("The jurisdiction of the Board over— (1) transportation by rail carriers, and the remedies provided in this part with respect to rates, classifications, rules (including car service, interchange, and other operating rules), practices, routes, services, and facilities of such carriers; and (2) the construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching, or side tracks, or facilities, even if the tracks are located, or intended to be located, entirely in one State, is exclusive. Except as otherwise provided in this part, the remedies provided under this part with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law.").

[76] *See City of Ozark v. Union Pac. R.R. Co.*, 843 F.3d 1167, 1171 (8th Cir. 2016).

[77] *See id.*

otherwise.[78] Bucket three, however, may be implicated. And that bucket includes state laws that "would have the effect of preventing or unreasonably interfering with railroad transportation."[79] To determine whether a state law falls within this bucket, the Court is required to engage in "a factual assessment" of the likely effects of the law at issue as applied to the circumstances at issue.[80]

As explained above, the premise of Union Pacific's argument is that the severability ruling from the Supreme Court of Arkansas "mandates that (i) employees may bring firearms onto all employers' parking lots and (ii) all employers *except* rail carriers enjoy complete immunity from any resulting liability."[81] And based on this premise, Union Pacific argues that the statutory scheme, as a whole, "discriminates against railroad carriers."[82] There are several problems with this argument.

First, the test governing the Bucket-three preemption analysis in the Eighth Circuit is not whether the law "discriminates against rail carriers."[83] Rather, the test is "whether th[e] action would have the effect of preventing or unreasonably interfering with railroad transportation."[84] It is true that other circuits have added a gloss onto this test that focuses on whether a state law

---

[78] Bucket one includes "any form of state or local permitting or preclearance that, by its nature, could be used to deny a railroad the ability to conduct some part of its operations[.]" *Id.* (quoting *CSX Transp., Inc.*, Fin. Dkt. No. 34662, 2005 WL 1024490, at *2–3 (S.T.B. May 3, 2005)). Bucket two includes state laws that regulate matters "directly regulated by the [STB]—such as the construction, operation, and abandonment of rail lines." *Id.* (alteration in original) (quoting *CSX Transp., Inc.*, 2025 WL 1024490, at *2–3).

[79] *Id.* (quoting *CSX Transp., Inc.*, 2005 WL 1024490, at *2–3); *see also Tubbs v. Surface Transp. Bd.*, 812 F.3d 1141, 1144–45 (8th Cir. 2015) (collecting cases).

[80] *City of Ozark*, 843 F.3d at 1171 (quoting *CSX Transp., Inc.*, 2005 WL 1024490, at *2–3).

[81] Pl.'s Mem. in Supp. Summ. J. (Doc. 53) at 20–21 (emphasis in original).

[82] *Id.* at 19.

[83] *Id.*

[84] *Compare id.*, *with City of Ozark*, 843 F.3d at 1171 (quoting *CSX Transp., Inc.*, 2005 WL 1024490, at *2–3).

discriminates against railroads.[85] But in this Circuit the question remains whether the state law prevents or unreasonably interferes with railroad transportation.[86]

Second, under the proper analysis, state laws are preempted when they "impede rail operations or pose undue safety risks."[87] The statutory scheme in this case does neither of these things. Section 11-5-117 does not impede rail operations. In fact, the state law at issue does not affect rail operations at all. There is no reason to think—and there is certainly nothing in the record to suggest—that rail operations would be impeded by firearms in locked vehicles in a parking lot. There is also no reason to think—and nothing in the record to suggest—that the law imposes undue safety risks. To be clear: we are talking about firearms locked in cars in a parking lot. We are not talking about employees walking into work with firearms, attending meetings with firearms, riding the rails with firearms, working with flammable or combustible materials while wearing firearms, leaving firearms in a workplace locker or cubby, or any of the cadre of other situations one could imagine that have some reasonable (even if small) likelihood of danger.

Of course, as with literally everything in life, the risk of letting an employee have a lawfully owned firearm in his locked car in the railroad parking lot is not zero. But "not zero" is far from an "undue safety risk." And that is especially true when the other side of the ledger touches—even indirectly—on the Second Amendment right to keep and bear arms. It is not lost on the Court that the Arkansas law at issue helps make it more practical for an individual to exercise his Second Amendment rights while engaging in everyday life. Whether the Court likes or dislikes this policy is beside the point. The point is that there is a reasonable policy justification

---

[85] *See, e.g.*, *Adrian & Blissfield R. Co. v. Village of Blissfield*, 550 F.3d 533, 541 (6th Cir. 2008).

[86] *See City of Ozark*, 843 F.3d at 1171.

[87] *Id.* at 1172 (quoting *Tri-City R.R. Co.*, Dkt. No. FD 35915, 2016 WL 5904750, at *6 (S.T.B. Sept. 12, 2016)).

undergirding the state law and a negligible safety risk from the law. In such circumstances, the Court cannot possibly say that the state law poses an "undue safety risk[]."[88]

Third, even if the applicable preemption analysis did focus on whether the state law at issue discriminated against railroads, Union Pacific would not prevail here. The out-of-circuit, discrimination-focused caselaw cited by Union Pacific establishes that a state law escapes preemption if it "address[es] state concerns generally, without targeting the railroad industry."[89] Of course, as Union Pacific argues, a law that is facially neutral and of general applicability may still be found to be discriminatory if there is evidence that the facially neutral and generally applicable nature of the law is pretext to hide discrimination.[90] That is just as true in the ICCTA context as it is in Equal Protection and Free Exercise contexts.[91]

The parking-lot-gun-rights provision codified at Section 11-5-117 is the epitome of a law that addresses state concerns generally. It is both facially neutral and generally applicable. It applies equally to all private employers in Arkansas. No one argues otherwise. Moreover, there is nothing in the record to suggest this is all a pretextual way to force railroads and only railroads

---

[88] *Id.* The Court is mindful of the fact that the question of whether a particular risk is "due" or "undue" is not really a judicial question. *Cf. Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 281–86 (2022) (discussing the unworkability of the "undue burden test"). But the governing test—to which this Court is bound—requires the Court answer that question. Accordingly, the Court does its best to answer a question it believes should not be asked of it.

[89] *Adrian & Blissfield R. Co.*, 550 F.3d at 541 (quoting *N.Y. Susquehanna & W. Ry. Corp. v. Jackson*, 500 F.3d 238, 254 (3d Cir. 2007)).

[90] *See* Pl.'s Mem. in Supp. Summ. J. (Doc. 53) at 21 (citing *Vt. Ry., Inc. v. Town of Shelburne*, 287 F. Supp. 3d 493 (D. Vt. 2017), *aff'd*, 918 F.3d 82 (2d Cir. 2019)). In the *Vermont Railway* case, a federal district court concluded that "testimony of several [witnesses] . . . support[ed] a finding that the Storage Ordinance was enacted as a result of th[e] litigation and in an effort to discriminate against the Railway." 287 F. Supp. 3d at 501. Moreover, the Railway was the only facility in town actually affected by the ordinance. *Id.* at 500–02. In short, there was evidence that the facially neutral and generally applicable nature of the ordinance was pretext to hide discrimination against a railroad company.

[91] *See, e.g.*, *Gomillion v. Lightfoot*, 364 U.S. 339, 347 (1960); *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977); *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 534 (1993).

to allow their employees to bring guns into their parking lots.[92] Put simply, "[t]his is not an instance in which the state has chosen to require something of the [r]ailroad that it does not require of similarly situated entities."[93]

To be fair, Union Pacific isn't exactly saying that Section 11-5-117 on its own is discriminatory against railroads. What Union Pacific is really saying is that Section 11-5-117 is discriminatory against railroads because FELA preemption bars the liability-immunity that Arkansas gives to all other private employers. But read that last sentence again and you will note that any differential treatment between railroads and other private Arkansas employers is due solely to federal law and not state law. Left to its own devices, the Arkansas law at issue would provide liability-immunity to railroads. Indeed, the Arkansas law at issue actually provides liability-immunity to all private Arkansas employers—railroads and non-railroads alike. It is just that federal law makes that provision inoperable to railroads.

Union Pacific has cited no cases where a state law has been found to be discriminatory because of differential treatment that was caused by way of federal preemption. And the Court has found no such case. This is not particularly surprising. Where the source of the differential treatment between railroads and other employers is a federal law that partially preempts the benefits a state law is trying to provide to everyone, it would be quite astonishing to conclude that it was *the state* that was discriminating against railroads.

For the reasons stated, the Court holds that the ICCTA does not preempt Section 11-5-117.

---

[92] To the extent there is some evidence to suggest that Union Pacific's prohibition on guns in the parking lot was the actual impetus for the 2017 and 2021 legislation, that is not enough to show targeting or discrimination. *See* Pl.'s Reply in Supp. Summ. J. (Doc. 67) at 12–13. Just because a general problem was first identified in the context of one specific employer does not suggest that the general solution is secretly intended only for the one specific employer.

[93] *See Adrian & Blissfield R. Co.*, 550 F.3d at 541–42.

**RLA PREEMPTION**

The Railway Labor Act, at least as amended, was a significant piece of New Deal legislation that focused on employer-union relations, primarily in the context of the railroads. The RLA provides "for the prompt and orderly settlement of all disputes growing out of grievances or out of the interpretation or application of agreements covering rates of pay, rules, or working conditions."[94] The RLA also imposes on "[railroads] and employees the duty of exerting every reasonable effort to settle these disputes by agreement . . . ."[95]

More specifically, and more relevantly to our case, the RLA "establishes a mandatory arbitral mechanism for 'the prompt and orderly settlement' of two classes of disputes"—major and minor disputes.[96] A major dispute occurs when the employer and union do not yet have (and are trying to form) a collective bargaining agreement or when those parties seek to change or amend an existing agreement.[97] None of the parties in our case contend that a major dispute exists.[98] But Union Pacific contends that a minor dispute exists. A minor dispute occurs when the employer and union dispute the meaning or proper application of a particular provision of a collective bargaining agreement with reference to a specific situation.[99]

Union Pacific argues that, to determine the merits of Mr. Franklin's and Mr. Craig's

---

[94] *Terminal R. Ass'n of St. Louis v. Bhd. of R.R. Trainmen*, 318 U.S. 1, 5 (1943) (quoting 45 U.S.C. § 151a).

[95] *Id.*

[96] *Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 252 (1994) (quoting 45 U.S.C. § 151a).

[97] *See Consol. Rail Corp. v. Ry. Lab. Execs.' Ass'n*, 491 U.S. 299, 302 (1989); *Elgin, J. & E. Ry. Co. v. Burley*, 325 U.S. 711, 723 (1945).

[98] *See* Pl.'s Mem. in Supp. Summ. J. (Doc. 53) at 13–16; Defs.' Resp. to Summ. J. (Doc. 60) at 4–5.

[99] *See Bhd. Ry. Carmen of U.S. & Canada, Div. of Transp. Commc'ns Union v. Mo. Pac. R.R. Co.*, 944 F.2d 1422, 1426 (8th Cir. 1991) ("[A] minor dispute involves the interpretation or application of an existing agreement."); *see also Bhd. of Maint. of Way Emps. v. Burlington N. Santa Fe R.R.*, 270 F.3d 637, 638 (8th Cir. 2001) (per curiam) ("[A] dispute that is arguably justified by the terms of the [collective bargaining agreement] is minor.").

statutory claims, this Court must look at and analyze the meaning of the collective bargaining agreement. According to Union Pacific, that requires the Court to refrain from ruling on the merits of their claims and instead dismiss those claims in favor of mandatory arbitration before the National Railroad Adjustment Board.[100] The Court disagrees with Union Pacific. With respect to Union Pacific's minor-dispute theory, the RLA only preempts a dispute from being heard in a federal court if it "involv[es] the interpretation or application of existing labor agreements."[101] As explained below, the present dispute does not.

To establish a violation of Section 11-5-117, a plaintiff need only show that a private employer knowingly "prohibit[ed] or attempt[ed] to prevent an employee from entering the parking lot of the private employer's place of business because the employee's private motor vehicle contains a firearm if the firearm is: (1) [k]ept for lawful purposes; and (2) [s]tored out of sight inside a locked private motor vehicle."[102] No analysis of any collective bargaining agreement is required to make that determination in this case. The Court need only look at historical facts which establish (or rebut) the statutory elements. And, at least in the instant case, those facts are not in the collective bargaining agreement. The relevant historical facts here are that Union Pacific has a rule—which it has enforced and threatens in the future to enforce by way of serious discipline—that employees may not bring firearms onto railroad property. Having a rule that an employee may not bring a covered firearm onto railroad property and disciplining or

---

[100] *See* Pl.'s Mem. in Supp. Summ. J. (Doc 53) at 13–16. Union Pacific suggests that, if the Court agrees with Union Pacific on this point, the Court should issue a declaratory judgment in favor of Union Pacific as well as dismiss Mr. Franklin's and Mr. Craig's statutory claims. *See id.* at 22.

[101] *Hawaiian Airlines, Inc.*, 512 U.S. at 256 ("[T]he RLA . . . does not pre-empt causes of action to enforce rights that are independent of the [collective bargaining agreement].").

[102] Ark. Code Ann. § 11-5-117(c).

threatening to discipline an employee for doing so, clearly constitutes prohibiting or attempting to prevent an employee from entering the parking lot with said firearm in the employee's car.

Union Pacific's contrary argument appears to be that Mr. Frankin and Mr. Craig, like all Union Pacific employees, have each agreed through a collective bargaining agreement to waive whatever right Arkansas gives them to bring guns onto railroad property.[103] The flaw in this argument is that the Arkansas law at issue prevents an employer from doing anything to stop an employee from bringing a covered firearm into the employer's parking lot.[104] This would include creating a rule and getting employees to agree to that rule—whether through collective bargaining agreements or otherwise. In either situation, the employer would be doing something that prohibited or attempted to prevent an employee from bringing a firearm into the parking lot. Perhaps a better way to say all this is that the Arkansas law at issue prevents an employer from circumventing the statutory gun-rights protection for employees through agreements or waivers. And none of that is particularly surprising. Employees can't waive their Title VII rights not to be discriminated against or their state-criminal-law rights not to be assaulted through collective bargaining agreements or any other agreement. It's no different with Section 11-5-117.

Union Pacific's attempt to address this problem falls flat. Union Pacific argues that the

[103] *See* Pl.'s Mem. in Supp. Summ. J. (Doc 53) at 11. To be as generous as possible to Union Pacific, the argument might actually be even more sophisticated. Union Pacific might be arguing that it is not violating Section 11-5-117 because, since Mr. Franklin and Mr. Craig have each agreed through their collective bargaining agreement not to bring a firearm onto railroad property, Union Pacific's rule (and any discipline arising out of it) is not actually the thing that is prohibiting or attempting to prevent Mr. Franklin and Mr. Craig from bringing their firearms into the parking lot. Put another way, Union Pacific is not prohibiting or attempting to prevent anything if Mr. Franklin and Mr. Craig have voluntarily agreed to abstain from the conduct that Union Pacific does not want. Union Pacific's point seems to be that determining whether it has violated the statute—i.e., whether it has prohibited or attempted to prohibit anything—thus requires analyzing the collective bargaining agreements. Whether Union Pacific is pressing only the waiver version of its argument, or instead this more sophisticated version, the Court's analytical resolution is the same.

[104] *See* Ark. Code Ann. § 11-5-117.

State of Arkansas can't exclude this issue—bringing firearms into a company parking lot—from the collective bargaining process.[105] More specifically, Union Pacific argues that, if this is what Section 11-5-117 does, the section would be preempted by the RLA.[106] But that is not correct.

There is no doubt that, absent any federal law to the contrary, Arkansas would be permitted to enforce the statute at issue.[107] States "have long regulated a great variety of conditions in transportation and industry, such as sanitary facilities and conditions, safety devices and protections, purity of water supply, fire protection, and innumerable others."[108] Because of the states' clear, broad, and historic police powers, "courts sustain a local regulation 'unless it conflicts with federal law or would frustrate the federal scheme, or unless the courts discern from the totality of the circumstances that Congress sought to occupy the field to the exclusion of the States.'"[109] None of the triggers for federal preemption are applicable here.

In *Brotherhood of Railroad Trainmen*, the United States Supreme Court considered whether an Illinois order requiring cabooses on trains for the safety of employees was preempted by the RLA.[110] The party favoring preemption argued that the RLA prevents states from entering an order which relates to railroads' "movements in interstate commerce[.]"[111] The Supreme Court

---

105 *See* Pl.'s Mem. in Supp. Summ. J. (Doc 53) at 16–18.

106 *Id.*

107 *See Wyeth v. Levine*, 555 U.S. 555, 565 (2009) ("[W]e 'start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.'" (quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996))).

108 *Bhd. of R.R. Trainmen*, 318 U.S. at 6–7.

109 *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 209 (1985) (quoting *Malone v. White Motor Corp.*, 435 U.S. 497, 504 (1978)). Union Pacific does not argue that the RLA expressly preempts the Arkansas law at issue. *See* Pl.'s Mem. in Supp. Summ. J. (Doc 53) at 12–18. Instead, Union Pacific's theory of preemption is limited to implied preemption.

110 *See Bhd. of R.R. Trainmen*, 318 U.S. at 3.

111 *Id.* at 2.

expressly rejected this argument.[112] The Supreme Court reasoned that, although the RLA creates a framework for dispute resolution, the RLA "does not fix . . . generally applicable standards" for wages, hours, or conditions.[113] Another way of saying this is that the RLA is about how employers and employees resolve open issues of wages, hours, and working conditions, but the RLA does not prevent states from creating baselines with respect to those issues. Indeed, the Supreme Court has quite clearly said that the RLA does not operate as a "pre-emption of the field of regulating working conditions themselves[.]"[114]

The Supreme Court has taken this same position in the context of a state law establishing a cause of action for wrongful discharge.[115] In that case, the Supreme Court emphasized that "[p]re-emption of employment standards 'within the traditional police power of the State' 'should not be lightly inferred.'"[116] And, therefore, the Supreme Court made clear that "substantive protections provided by state law, independent of whatever labor agreement might govern, are not pre-empted under the RLA."[117] To put it plainly, the RLA does "not grant the parties to a collective-bargaining agreement the ability to contract for what is illegal under state law."[118] This

[112] *See id.* at 7.

[113] *Id.* at 6.

[114] *Id.* at 7.

[115] *See Hawaiian Airlines, Inc.*, 512 U.S. at 266.

[116] *Id.* at 252 (quoting *Fort Halifax Packing Co., Inc. v. Coyne*, 482 U.S. 1, 21 (1987)).

[117] *Id.* at 257.

[118] *Id.* at 260 (quoting *Allis-Chalmers Corp.*, 471 U.S. at 212); *see also Metro. Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 754 (1985) ("The evil Congress was addressing thus was entirely unrelated to local or federal regulation establishing minimum terms of employment."); *Fort Halifax Packing Co., Inc.*, 482 U.S. at 20–21 ("Such regulation provides protections to individual union and nonunion workers alike, and thus 'neither encourage[s] nor discourage[s] the collective-bargaining processes that are the subject of the NLRA.'" (alterations in original) (quoting *Metro. Life Ins. Co.*, 471 U.S. at 755)); *Allis-Chalmers Corp.*, 471 U.S. at 212 ("Such a rule of law would delegate to unions and unionized employers the power to exempt themselves from whatever state labor standards they disfavored."). The Court recognizes that many of these cases are about the Labor Management Relations Act as opposed to the RLA. But the Supreme Court has used LMRA caselaw to analyze the RLA for years. *See Hawaiian Airlines, Inc.*, 512 U.S.

is why the Supreme Court has "expressly disavow[ed] any language in [other cases] suggesting that minor disputes encompass state-law claims that exist independent of the [collective bargaining agreement]."[119]

The Court imagines that Union Pacific would agree that a state law preventing an employer from assaulting an employee would not be preempted by the RLA on the theory that the law removes an issue of working conditions from the universe of negotiation. The Court also imagines that Union Pacific would similarly agree that a state law preventing sexual harassment of employees would not be preempted by the RLA on the theory that the law removes an issue of working conditions from the universe of negotiation. Despite Union Pacific's assertions to the contrary,[120] the Court sees no analytical daylight between such laws and Section 11-5-117.

at 260.

[119] *Hawaiian Airlines, Inc.*, 512 U.S. at 264–65. Union Pacific cites an Eleventh Circuit decision which found an Alabama law that granted longevity pay to state employees was preempted by the RLA. *See* Pl.'s Mem. in Supp. Summ. J. (Doc. 53) at 16 (citing *Hull v. Dutton*, 935 F.2d 1194 (11th Cir. 1991)). But that case clearly differentiated between statutes where the state is the employer and thus has "a much narrower latitude to enact laws that trench upon the terms of a collective bargaining agreement" and laws that are "'valid and unexceptional exercise[s] of the [state's] police power' and applied not only to union and nonunion members, but also to those workers not employed by the state." *See Hull*, 935 F.2d at 1198 (alteration in original) (footnote omitted) (quoting *Metro. Life Ins. Co.*, 471 U.S. at 785). Unlike the law at issue in that case, the law passed by Arkansas is an "ordinary part of the grist for the legislative mill that turns daily[,]" and although the law "may 'touch[] and concern[] . . . the complex interrelationships between employees, employers, and unions,' Congress did not intend that [it] be preempted by federal labor legislation." *See id.* (alterations in original) (footnote omitted) (quoting *Metro. Life Ins. Co.*, 471 U.S. at 757).

[120] *See* Pl.'s Mem. in Supp. Summ. J. (Doc. 53) at 12. Union Pacific cites *Railway Employes' Department v. Hanson*, for its flashy quote: "A union agreement made pursuant to the Railway Labor Act has, therefore, the imprimatur of the federal law upon it and, by force of the Supremacy Clause of Article VI of the Constitution, could not be made illegal nor vitiated by any provision of the laws of a State." *See id.* (quoting 351 U.S. 225, 232 (1956)). But that case involved a RLA provision that allowed union shop agreements while the state law explicitly prohibited them—i.e., straightforward direct conflict preemption. *See Hanson*, 351 U.S. at 230–31. The sentence right before the one quoted by Union Pacific notes that the federal amendment which permitted union shop agreements expressly allowed those agreements notwithstanding the law of any State. *See id.* at 232. Thus, of course, those union shop agreements made pursuant to the federal statute would have the "imprimatur of the federal law upon" them because they are explicitly allowed and thus automatically trump state law prohibiting them. *Id.* The same is surely not true for all terms of all collective bargaining agreements made pursuant to the RLA. *See Hawaiian Airlines, Inc.*, 512 U.S. at 257 ("[S]ubstantive protections provided by state law, independent of whatever labor agreement might govern, are not pre-empted under the RLA.").

Section 11-5-117 is creating a baseline protection for employees that the State believes to be warranted. It is true, of course, that assault and harassment laws speak to what an employer may not do to an employee, while Section 11-5-117 speaks to what an employer has to allow with respect to an employee. But this is a distinction without a difference with respect to the RLA. The affirmative-rights-negative-rights dichotomy does not affect whether a particular law concerns working conditions. Just like the two example laws posited by the Court concern working conditions and would not be preempted, Section 11-5-117 concerns working conditions and would not be preempted.[121]

From what the Court has said above—and also in footnote 121—it follows that the parking-lot-gun-rights provision at issue in our case does not conflict with the RLA, does not frustrate the objectives of the RLA, and is not subject to field preemption. Union Pacific can

[121] It's worth mentioning that the RLA says it was enacted for the following reasons: "(1) [t]o avoid any interruption to commerce or to the operation of any carrier engaged therein; (2) to forbid any limitation upon freedom of association among employees or any denial, as a condition of employment or otherwise, of the right of employees to join a labor organization; (3) to provide for the complete independence of carriers and of employees in the matter of self-organization to carry out the purposes of this chapter; (4) to provide for the prompt and orderly settlement of all disputes concerning rates of pay, rules, or working conditions; (5) to provide for the prompt and orderly settlement of all disputes growing out of grievances or out of the interpretation or application of agreements covering rates of pay, rules, or working conditions." 45 U.S.C. § 151a. This is consistent with the RLA's creation of a standardized mechanism for dispute resolution in the railway industry, but not with the blanket preemption of state laws that happen to touch on working conditions. For sure, 45 U.S.C. § 152 makes it the "duty" of carriers and employees to "make and maintain agreements concerning rates of pay, rules, and working conditions, and to settle all disputes[.]" 45 U.S.C. § 152 First. Also for sure, a carrier is prevented from changing the "rates of pay, rules, or working conditions of its employees, as a class[.]" *Id.* Seventh. But contrary to Union Pacific's characterization that the "RLA requires that [subjects of bargaining] be left unregulated by state law and governed by agreement of the parties[,]" *see* Pl.'s Mem. in Supp. Summ. J. (Doc. 53) at 17, nothing in 45 U.S.C. § 152 clearly commits the topic of working conditions to the bargaining process such that states are completely unable to regulate working conditions. Section 152 only requires that the parties do bargain and make agreements where topics are negotiable. The same is true of 45 U.S.C. § 153. Section 153 establishes the NRAB but does not give it jurisdiction to permanently fix working conditions. *See generally* 45 U.S.C. § 153. Although the NRAB is given "jurisdiction over . . . [t]he disputes between an employee or group of employees and a carrier or carriers growing out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions," nothing in this sentence implies that the NRAB also has the power to fix generally applicable standards for working conditions or preclude a state from passing working standards. *Id.* First (i). Instead, the sentence creates only a jurisdictional carveout to hear disputes arising out of grievances and interpretations of collective bargaining agreements which encompass agreed upon working conditions.

follow the state law without violating the RLA. The state law does not undermine the union-employer bargaining relationship to the extent that it would be considered a frustration of the federal interests advanced by the RLA. And the Supreme Court has clearly closed the door to any suggestion of field preemption.

Union Pacific's best response to all this is a Seventh Circuit case titled *Miller v. Southwest Airlines Co.*[122] But that case does not bind this Court. Moreover, the principle Union Pacific ascribes to *Miller* is dicta. And, in any event, *Miller* is distinguishable from the instant case in very important ways.

In *Miller*, Illinois enacted a law that required an individual or his legally authorized representative to consent to the use of biometric information for time keeping purposes.[123] The parties in *Miller* disputed whether the union consented to the use of biometric data.[124] The Seventh Circuit ordered the district court to refer the case to an adjustment board because the Seventh Circuit concluded that interpretation of the collective bargaining agreement was required to determine whether the union had consented to the use of biometric data.[125] Of course, this is not at all like our case. In our case, the Arkansas law at issue completely removes the firearms-in-parking-lots issue from the bargaining table such that the collective bargaining agreement is completely irrelevant to whether the statute has been violated.[126]

The Court acknowledges that *Miller*, in dicta, said that "[a] state cannot remove a topic

---

[122] *See* Pl.'s Mem. in Supp. Summ. J. (Doc. 53) at 10–18 (citing 926 F.3d 898 (7th Cir. 2019)).

[123] *See Miller*, 926 F.3d at 900.

[124] *Id.* at 903.

[125] *Id.* at 904–06.

[126] *See* Ark. Code Ann. § 11-5-117.

from the union's purview and require direct bargaining between individual workers and management."[127] But, in context, all this meant was that the RLA would preempt a state from taking a subject of union/employer bargaining and requiring the employer to instead bargain over that subject with individual employees.[128] So understood, this out-of-circuit dicta seems unobjectionable because the RLA creates a process for dispute resolution that makes unions the employees' exclusive bargaining agents.[129] A state law can't leave a topic on the table for negotiation but require the negotiation to be carried out by someone other than the union. That actually would frustrate the objectives of the RLA. However, as the Court has noted numerous times in this Order, that is not what is going on here. In our case, the state law at issue removes the firearms-in-parking-lots issue from the bargaining process completely. Whatever one thinks of the wisdom or folly of this law, what the law has done is far different from what the law in *Miller* did. The *Miller* dicta is simply not applicable here.

For the reasons stated above, the RLA does not preempt Section 11-5-117, and this case is not one that must be committed to arbitration in front of the NRAB.

**CONCLUSION**

For the reasons stated above, the Court DENIES Union Pacific's Motion for Summary Judgment (Doc 52). The Court requests that the parties attend a telephonic status conference to determine how they would like to proceed following this Order. Court staff will reach out to determine a convenient date for the requested status conference.

---

[127] *Miller*, 926 F.3d at 903.

[128] *See id.*

[129] *See* 45 U.S.C. § 152 First.

IT IS SO ORDERED this 30th day of September 2026.

LEE P. RUDOFSKY
UNITED STATES DISTRICT JUDGE